Dennis et al. *v.* McCagg et al.

## ALEXANDER DENNIS *et al.*
### *v.*
## EZRA B. MCCAGG *et al.* -

| | |
|---|---|
| 32 | 429 |
| 139 | 391 |
| 144 | 225 |
| 32 | 429 |
| 47a | 586 |
| 32 | 429 |
| 167 | 84 |
| 68a | 590 |
| 32 | 429 |
| 183 | 512 |
| 32 | 429 |
| 91a | 8167 |

1. AGENCY—*whether voluntary or by employment.* Whether one performs acts of agency for others, under an employment by them, or as a volunteer, can make no difference as to his responsibilities growing out of that relation.

2. AGENT, TRUSTEE, &C.—*cannot deal in the matter of agency.* In equity, an agent is disabled from dealing in the matter of his agency, on his own account.

3. Trustees and others sustaining a fiduciary and confidential relation, cannot deal on their own account with the thing, or the persons falling within that trust or relationship.

This rule is applied to all persons in whom there is a trust and confidence reposed, which would bring in conflict the interest of the trustee and *cestui que trust.*

4. In a suit in chancery to subject lands to the payment of purchase-money remaining unpaid under a contract of purchase, a decree passed, directing that in the event of nonpayment of the money within a given time, the land should be sold. A third party, assuming to act in behalf of the defendants in the decree, either by employment or voluntarily, paid over his own money to the complainant within the time prescribed in the decree, and took a deed from him for the premises in his own name. *Held,* that the party making the redemption, held the title thus acquired in trust for the benefit of those for whom he was assuming to act, and as security only for his advances.

5. It was held, in view of the confidential relation existing between the parties, to be immaterial whether the time of redemption had expired or not, when the money was paid and the conveyance made to the agent. In either case, those for whom he was professing to redeem were entitled to the benefit of his acts.

6. AGENT — *must not withhold facts in dealing with his principal.* Where the agent who had thus acquired title, subsequently obtained from the parties interested, conveyances for their interest, they being ignorant of the fact that the agent had already redeemed the land, it was held not to avail him. It was his duty to have put them in possession of all the facts known to himself.

7. PURCHASERS WITHOUT NOTICE — *how far protected.* And where he had sold a portion of the premises to parties who were not apprised of the equity of the principal parties in interest, their title would be protected.

8. AGENT — *to what extent held responsible to his principal.* But the agent, who had thus put the title beyond their reach, can be compelled to indemnify his principals for the loss and injury thereby sustained, either by requiring him to pay over the purchase-money he received for the land, with interest, or the present value of the land, as may be deemed most equitable.

9. TIME, *of the essence of contracts — how waived.* Although time may have been made of the essence of a contract for the sale of land, so that the purchaser on failing to make payment on the day, would forfeit his right to do so afterward, yet, if the assignee of the vendor, after the right to declare the forfeiture has accrued, proceed in chancery for a specific performance, and obtains a decree giving a certain time for payment, this will rehabilitate the purchaser to all his rights, the time given in the decree completely reinstating him.

APPEAL from the Superior Court of Chicago.

This was a suit in chancery instituted in the court below by the appellants, the heirs-at-law of Oliver Dennis, senior, deceased, against Ezra B. McCagg and others. The bill alleges that the complainants were of French birth, and resided in Canada until the year 1846, when they removed to Chicago; that they were ignorant and unable to speak the English language, or to understand it.

That in the spring of 1847, the ancestor of the complainants, Oliver Dennis, senior, purchased from Francis Blanchard, a tract of land situate in Cook county, in this State, consisting of twenty acres off the south end of the east half of the southwest quarter of section thirty-four, in township thirty-nine, north of range fourteen east, &c. The price to be paid for the land was $1,000, $450 of which was paid in hand, $300 to be paid May 1st, 1848, and $250, one year thereafter, with six per cent. interest.

Blanchard executed his bond, bearing date on the 26th of April, 1847, which was duly acknowledged and recorded, by which he agreed to convey the land to Oliver Dennis, senior, the purchaser, or to his representatives, on being paid the purchase-money as above mentioned.

Dennis entered into possession of the land, and resided upon it with his family until the time of his death, in February, 1849; but he never met either of the deferred payments. Subsequently, in November, 1851, Blanchard executed to Paul Cornell, a quit-claim deed for the premises.

The bill further sets forth that in December following, Cornell instituted a suit in chancery, in the Cook County Court of Common Pleas, against the administratrix, widow and heirs of Oliver Dennis, senior, deceased, for a foreclosure against them; and on the 6th of April, 1852, obtained a conditional decree in that suit, ordering the defendants to pay, or cause to be paid, to Cornell, the sum of $711, with interest and costs, within thirty days from the date of the decree, or be foreclosed. The decree further provided that upon the payment of the money, Cornell should convey the land to the defendants.

The bill then alleges that John B. Valliquette, the husband of one of the daughters of Dennis, and at the time in the employ of Scammon & McCagg, partners in the practice of law in Chicago, as their servant, and the gardener of Scammon, represented to the rest of the family that he could borrow the money of Scammon, on the security of the land, at least for a short time, by which they would be enabled to make the redemption under the decree; that, as the agent and representative of the others, he went to the office of Scammon & McCagg for this purpose; but not finding Scammon in, and thinking the case admitted of no delay, he opened the matter to McCagg, and requested him to loan the defendants in that suit the sum necessary to redeem the premises, according to the decree, upon the security of the land.

The bill states that McCagg, after hearing the business and request of Valliquette, told him to call again soon, and he would inform him whether he would loan the money or not;

that Valliquette did call again soon after, when McCagg told him he had concluded to loan him the money, that it was all arranged, and that he had, or would, deposit it with the clerk. That McCagg did so deposit the money with the clerk, or carried it to the clerk's office for that purpose, and stated to the clerk that he had brought the money to redeem this land for the widow and children, and paid the money to the clerk, or to Cornell himself, to redeem the land under the decree, and before the time of redemption had expired. It is further alleged that Cornell received the money, as he was compelled to do by the decree, and took no further steps to perfect his title to the land, and afterward conveyed the land to McCagg, as security for the payment of the money, in pursuance of the agreement previously made between McCagg and Valliquette; and that this conveyance was so understood by all the parties at the time. Soon after this, Valliquette called on McCagg to learn more particularly the terms of said loan, and McCagg told him he did not understand the matter; that he, McCagg, had purchased the land for himself and owned it. That his title was perfect, but, as a matter of favor, he would give each one of the heirs thirty-five to fifty dollars if they would quit-claim to him.

It is stated in the bill that the application for this loan was made to Scammon & McCagg, on account of the relation Valliquette sustained to them, and on account of their position in their profession and in the community; and therefore, when McCagg told them that they had lost the land, and that he had purchased it, they believed, and a part of the heirs and the widow conveyed or quit-claimed to him.

The complainants charge that these statements were false, and were intended by McCagg to deceive and defraud the complainants, for his own advantage and emolument, contrary to equity and good conscience.

The bill alleges that five of the complainants were minors at the time the proceedings were had in the suit of Cornell against the widow and heirs, and at the time of the conveyances to McCagg. Two of the heirs did not convey at all.

These are substantially the grounds of complaint. The oath of the defendants to their answers is waived.

The prayer of the bill is, that the conveyance of Cornell, and of those of the heirs who conveyed to McCagg, be decreed a mortgage, and that complainants be allowed to redeem on paying what may be justly due, on an account taken; and that on being paid what thus appears to be due, the defendant McCagg and his co-defendants, who were subsequent purchasers of a part of the premises from him, be decreed to convey and deliver up said land to the complainants; and for general relief.

McCagg answered the bill, admitting the French origin of the complainants, and their ignorance of the English language, but says they were sharp at a bargain, and took no steps they did not comprehend. He admits that Blanchard executed to Oliver Dennis, senior, the bond for the conveyance of the land mentioned, but does not know about the terms of that bond, and leaves the complainants to their proofs on that subject; but expressly states that time was of the essence of the contract, and that on the failure of Dennis to pay at the time stipulated, he was to forfeit all right to the land.

He further admits that Dennis lived on the land, and that he did not pay for it, but claims that he and his heirs forfeited it, and moved off the same, and gave up the possession to Blanchard, and that it was vacant and unoccupied for a long time before the defendant purchased it.

Admits the conveyance from Blanchard to Cornell, and the institution of the suit in chancery by Cornell, against the widow and heirs of Oliver Dennis, senior, and claims that in that suit a decree was rendered ordering the defendants therein to pay Cornell the sum of money specified therein, within thirty days from the date of the entry of the decree, and in default of such payment to be debarred and forever foreclosed. But he alleges that long before this, the defendants in that suit had forfeited and abandoned all claim to said land, and did not claim any interest in the same, and that the decree was not necessary to foreclose them from all right in the land. He says the defend-

ants in the decree not having paid the money according to its terms, it became absolute and final, and thereby the complainants became forever debarred of all right in the land, if any they had, which he denies.

McCagg denies that Valliquette was ever in his employ, but admits he was in the employ of J. Young Scammon, his law partner. He does not know about the representations of Valliquette, nor whether he went to the office of Scammon & McCagg to borrow the money required to be paid by the decree; does not admit or deny.

He admits that Valliquette did, at the office of Scammon & McCagg, advise defendant of said decree, and did ask him to loan him a sufficient sum to pay the decree; but denies that Valliquette desired to borrow said money on the security of said land, but on the contrary, wished to borrow it on his own credit.

He admits that Valliquette spoke to him more than once, but don't recollect how many times, about the decree, and defendant told him he was inclined to loan him the money, and that he would examine and see about the decree. He states that up to this time he had never seen any one of the complainants, and did not care for them, and did not promise, nor was he asked to promise, to loan them any sum of money whatever; but knowing Valliquette to be hardworking and industrious, he was disposed to help him if it was safe to do so. He denies that he ever told Valliquette that he would loan him the money on the security of the land, but on the contrary, states that only upon the credit of Valliquette himself, and his property, had he any idea of loaning the money.

McCagg denies that he ever told Valliquette that he had deposited, or would deposit, any money with the clerk of the Court of Common Pleas, or that Valliquette desired him so to do. He denies that he ever deposited the money with said clerk, or that he ever carried it to the office of the clerk, or stated to the clerk that he had brought the money to redeem the land, or that he ever paid the money to the clerk for Cornell, or to Cornell himself to redeem the land for these complainants.

He denies that the conveyance from Cornell to him was made as a security for the payment of the money, but that he bought the land and paid for it, and that in extinguishing Cornell's title, he paid to him more than the amount of the decree and interest, and more than he would have been obliged to pay if he had intended to redeem the land; and that at the time of said payment and purchase, the right to redeem under the decree had expired.

The answer further states that Valliquette did not finally wish to borrow the money for the purpose of redeeming the land, but desired defendant to buy out the interest, if any, of the heirs in the land, and defendant consented to purchase the land, and to pay to each of them a small sum for their interest. And thereupon, several of the heirs did convey their interests to the defendant, for the sum of $50 each, amounting in all to $500 more than the amount paid Cornell.

These are the material features of the answer of McCagg, showing the grounds of his claim of title to the premises.

His co-defendants answered, setting up their purchase of the land from McCagg, or from his grantee.

A replication was filed, and the cause came on for hearing.

The complainant introduced in evidence the bond for a conveyance of the premises from Blanchard to Oliver Dennis, senior, the conditions of which are substantially as set forth in the bill.

The deposition of Paul Cornell, the complainant in the suit in chancery mentioned, against the widow and heirs of Oliver Dennis, senior, taken on the part of the complainants, was read. The witness, in answer to the question whether any of the defendants in that suit, or any person for them, ever paid the sum of money mentioned in the decree rendered in that suit, or any sum, for any purpose connected with the land, stated:

I received the following letter from Mr. Barron, to which I refer to refresh my memory:

" CHICAGO, April 22d, 1852.

" FRIEND PAUL : — I am afraid you will lose your Dennis land. Mr. E. B. McCagg has this morning called to see you, and said he intended to redeem it. He said that Judge Skinner told

him that 30 days were given from the 13th of April to do so. The decree gives 30 days. Kimball wishes to enter the decree, and I have altered it as to taxes, and will return it to him to-day. Nothing else very new here. I had almost forgotten to mention that a gentleman from St. Louis, whose card I enclose, called yesterday about the Dennis land — wanted to buy it. Your only resource is to buy out the heirs if you can, and it must be done quick, or McCagg will be before you. I understand Tisdale is expected here soon.

"Yours, truly,
"WILLIAM T. BARRON.
"P. Cornell, Esq., Channotian, Ill:"

I returned to my office in two or three days, and consulted Mr. Barron. Barron told me that McCagg had been there, and had the money, and that I would probably find it in Mr. Kimball's office, and I concluded to go and get it. I went to Mr. Kimball, and he told me that Mr. McCagg had been there with the money, but told me I had better see McCagg. I then went to McCagg and told him he had caught me in a trap, or some such expression, and offered to divide the profits with him, and would give him the benefit of my decree. He said he would consult Mr. Scammon about it, and let me know in two or three days.

. In the course of a few days I saw him again; he stated he had concluded not to do so, stating as the reason why, that Mr. Scammon wanted to benefit Valliquette, a *protege* of his. I then complained a little, and told him I thought he ought to pay me more than the decree called for, under all the circumstances. He then said he would be liberal with me, and would pay me something more. He then gave me a check for $400, I guess at that very time, dated May 10, 1852, and said he would pay me the balance in a short time. The check was probably given on the day of its date. Mr. McCagg, my impression is, said he would pay me the balance in a short time — as soon as he could make arrangements with the parties — Mr. Scammon, or some other persons, as I supposed. Afterward, on the 14th of May, he gave me a check for $477.18, stating

that I must not complain, as it contained more than the amount of the decree and costs. I think he stated that he designed the excess to be sufficient to pay me a reasonable attorney's fee.

There were negotiations about the matter, as I have said. I think McCagg stated that he had been interested in the matter through Mr. Scammon, who was acting for, or was trying to protect Valliquette, his man. I think he stated something of the kind at each interview. I executed a conveyance of the land mentioned in the decree dated the 10th of May, 1852, to Ezra B. McCagg.

My impressions are, from what I base my recollection upon, that the time limited in the decree for redemption, did not expire until the 13th of May, after I conveyed to McCagg. I cannot remember distinctly.

All I remember in regard to it is this : At the time I applied to Judge Skinner for the decree and day to be fixed for redemption, I requested the court to make it twenty days, and got the impression from the court that if there was no opposing party in the case, as was then supposed there was not, the decree would be twenty days. But Mr. Barron afterward told me that it was thirty days.

I conveyed the land to McCagg, although the decree required me to convey to the Dennis heirs in case the money was paid, in consequence of the arrangement before stated with McCagg and the payment of the money. I cannot say for whose benefit I made the conveyance. I cannot tell certainly whether I conveyed to him as the representative of these complainants, or for his own benefit. I supposed it was to aid Valliquette, Scammon's *protege*; McCagg said so at the time.

At the time I made him the offer to take half the profits, there was a proposition made on my part to give him the benefit of the decree, and I suppose McCagg's design was to get the benefit of my decree. My impressions are now that McCagg meant to get that benefit which I had offered him. That's an opinion of mine.

I thought at the time, the land was worth about $1,500. I should not have sold for the price I received. I considered

myself compelled to take the money because McCagg had it in his power to redeem if he chose. There was no necessity that I know of, for McCagg's paying me more than the amount of the decree and interest in order to redeem. The amount paid me over that required in the decree was undoubtedly paid as the consideration for my making the deed directly to him. The excess was, I think, about 12 per cent. on the money instead of the legal rate, and the attorney's fee of about $50, and then I was to give McCagg a quitclaim deed which he desired.

*Walter Kimball,* the clerk of the Cook County Court of Common Pleas, whose deposition was also taken, testified, after referring to the decree in the suit of Cornell against the widow and heirs of Dennis, as follows:

Mr. McCagg came into my office some time within the thirty days within which the money was to be paid, to redeem under the decree, I think a very short time before the expiration of the thirty days, and made inquiries in relation to the payment of the money under the decree.

I knew that Mr. McCagg was not one of the parties to the suit, and was not to my knowledge, engaged in it as solicitor. My impression is that Mr. McCagg wished to pay the amount of money decreed to be paid, some 700 and odd dollars. I asked Mr. McCagg what he had to do with it. He told me that he wished to protect the interest of Mrs. Dennis and the heirs. I think I told him he had better go to Mr. Cornell and settle the matter with him, or words to that effect. My impression is, but of this I am not certain, that Mr. McCagg did bring the money with him; if he did, he took it away again, and did not make any deposit in the case; he was in my office but a very few minutes. My impression is that he brought the money in coin; I think he had it in a handkerchief. He did not state the name of any parties, except that he wished to protect the interests of Mrs. Dennis and the heirs.

This was all the evidence in relation to the questions involved in the decision of the court.

The defendants introduced the quitclaim deeds from Blan-

chard to Cornell, and from Cornell to McCagg, and from those of the heirs of Dennis who conveyed to McCagg.

The court below, upon consideration of the case, entered a decree dismissing the bill. From that decree the complainants took this appeal.

The question arising upon the record is, in what capacity did McCagg interfere with the property in controversy, whether he can be regarded, under the evidence, as the agent or attorney of these complainants, either employed by them or a volunteer in their behalf.

Messrs. D. P. WILDER and THOMAS HOYNE, for the appellants.

Messrs. SCAMMON, McCAGG & FULLER, for the appellees.

MR. JUSTICE BREESE delivered the opinion of the Court:

The question presented by this record is, what relation did the defendant McCagg sustain to the complainants, and in what capacity did he interfere with the property in question. Can he be regarded, under the evidence, as agent or attorney, either employed by them, or a volunteer in their behalf? The solution of this question determines the controversy.

It is charged in the bill, that McCagg was informed by Valliquette, one of the heirs, through his wife, of Oliver Dennis, deceased, the owner of the land by title bond, and who was an employee of J. Young Scammon, the law partner of McCagg, of the decree then existing against the heirs of Dennis, and was requested to advance the money to pay off the decree, and hold the land as security until he should be reimbursed principal and interest and expenses.

McCagg admits, in his answer, that Valliquette did advise him of the decree, and asked him for a loan of money to discharge it, but denies that he desired to borrow it on the security of the mortgaged land, but that Valliquette wished to borrow it on his own credit. He admits that Valliquette spoke to him more than once about the decree, and he told him that he was inclined to lend him the money, and would examine

and see about the decree; that he was disposed to help Valliquette if he could do so safely, but denies that he ever told Valliquette he would loan him the money on the security of this land. He also denies having told Valliquette that he had deposited the money, under the decree, or would deposit it, with the clerk.

These denials are not contradicted by any proof, and to that extent disprove the allegations in the bill, as to those facts, but they establish the fact that McCagg was incited to inquire into the decree, and into the case, by one of the parties then interested in it, who was ostensibly acting for the other parties in interest, the complainants herein.

The testimony of Mr. Kimball, who was clerk of the court in which the decree was rendered, shows that within the thirty days limited by the decree for the payment of the money, the defendant McCagg was at the office, and made inquiries in relation to the payment of the money under the decree. Knowing that Mr. McCagg was not one of the parties to the suit, and was not engaged in it as solicitor, the clerk asked him what he had to do with it, and he told the clerk that he wished to protect the interest of Mrs. Dennis and the heirs, and wished to pay the amount of money decreed to be paid, some seven hundred and odd dollars. The clerk told him he had better go to Mr. Cornell, who was the complainant in the foreclosure suit, and settle the matter with him. The clerk's impression is, that Mr. McCagg brought the money with him, in coin, in a handkerchief, but did not leave it; was in the office but a few minutes. He did not state the names of any parties except that he wished to protect the interests of Mrs. Dennis and the heirs. This was but a very short time before the time for redemption expired.

The decree was entered April 6, 1852, and the time expired on the 6th of May, 1852.

Here is shown an unequivocal act of agency by McCagg, whether by actual employment by the parties interested or as a volunteer, can make no difference as to his responsibilities growing out of that relation. The presumption is a very

strong, and a very natural one, that he was thus acting in consequence of the suggestions and by request of Valliquette, with whom, he admits, he had more than one conversation on the subject of the decree. If McCagg was not employed as an agent to investigate the case and to ascertain the rights of these complainants, he voluntary assumed to do so, and so represented himself to the clerk. He assumed a position of trust and confidence, and that relation imposed upon him the observance of the highest morality and integrity. He went to the office at the proper time, to protect the interests of Mrs. Dennis and the heirs, and under no other pretext, and for no other avowed purpose, and that could only be done, consistent with a high morality, by paying the redemption money, and holding the land thus redeemed, as security for his advances. It is evident, from the statements of the bill, and admissions of the answer, that a confidence was reposed in McCagg, that he would conduct this business for the benefit of the parties interested, the heirs of Dennis, and not for his own benefit. This would be an abuse of the confidence reposed, and it is this which courts of equity seize hold of, and rely upon, when they grant relief, in cases of this kind. Now, as to his further conduct in the matter. When advised by the clerk, that he had better see Cornell, and settle the matter with him, he has an interview with that gentleman, who had been apprized by a letter from Mr. Barron, his partner, of the date of April 22, 1852, of movements in regard to the land. Mr. Barron wrote Cornell, under that date as follows: "I am afraid you will lose your Dennis land. Mr. E. B. McCagg has this morning called to see you, and said he intended to redeem it. He said that Judge Skinner told him that 30 days were given from the 13th of April, to do so. The decree gives 30 days. * * *
* * Your only resource is to buy out the heirs if you can, and it must be done quick, or McCagg will be before you."

Cornell returned to Chicago in two or three days after the date of this letter, and consulted Mr. Barron. That gentleman told him that McCagg had been there, and had the money, and that he would probably find it in Mr. Kimball's office, and he

56

concluded to go and get it. When there, Kimball told him that Mr. McCagg had been there with the money, and that he had better see McCagg. He then went to McCagg and told McCagg he, McCagg, had caught him in a trap, and offered to divide the profits with him, and would give him the benefit of his decree. McCagg said he would consult Mr. Scammon about it, and let Cornell know in two or three days. In the course of a few days they again met, and McCagg stated he had concluded not to do so (divide the profits), giving as a reason why, that Mr. Scammon wanted to benefit Valliquette, a *protege* of his. McCagg stated he had been interested in the matter, through Mr. Scammon, who was acting for, or was trying to protect Valliquette, his ward; he thinks McCagg said something of this kind at each interview. By these pretenses, Cornell surrendered the land to McCagg, receiving some fifty or eighty dollars more than the amount of the decree, for his deed, supposing, as he says, it was to aid Valliquette, Scammon's *protege;* he (McCagg) said so at the time.

The first check for four hundred dollars, drawn by Scammon & McCagg, and payable to Cornell, is dated May 10, 1852, and Cornell's deed bears the same date; but yet, the evidence is quite satisfactory that the contract was made before the time of redemption had expired. McCagg, in his answer, avers that the time of redemption had expired when he made the arrangement with Cornell, and thereby the heirs of Dennis had lost all interest in the premises. The decree was passed April 6th, and thirty days allowed from that date, within which to redeem, yet Barron wrote Cornell that McCagg informed him the judge of the court had told him that the parties had thirty days from the 13th of April, for that purpose. Now, it may be that these parties were contracting with that day in view, yet it is not improbable that some mistake in the date of the check and of the deed, has been made, for Cornell says, in two or three days after the date of Barron's letter, he was at his office in Chicago, and consulted about this matter. This would bring the time to the 25th of April. "In a few days" after this, he had the interview with McCagg, and as five days

or ten days are but "a few days," this interview must have taken place on or before the fifth day of May, one day before the time of redemption expired. This must be so from Cornell's testimony, for he gives us distinctly to understand that he made the arrangement with McCagg, under the pressure of the decree; that he considered himself obliged to receive the money under the decree. If it were not so, is it reasonable to suppose, the time of redemption having expired, that he would have accepted eight hundred and seventy-seven dollars for his right to property, which could not be impeached, worth fifteen hundred dollars. This is not reasonable or probable. Had Cornell supposed the time of redemption had expired, he would never have accepted that sum for property he estimated to be worth, at that very time, nearly twice as much. He states distinctly, he should not have sold the land, at the price he received, if he had not considered himself compelled to take the money. But we think it immaterial whether the time of redemption had or not expired. If McCagg was acting for the complainants, they are as fully entitled to the benefit of his acts, no matter whether he secured the land after or before the expiration of the time of redemption. The conveyance made by him to McCagg, instead of being made directly to the complainants here, is explained by him, that he supposed the conveyance was to aid Valliquette, Mr. Scammon's *protege*, and that McCagg told him so at the time. Here then, is the most abundant proof of the relation in which McCagg stood to these parties, as a confidential agent, intrusted with the conduct of business, claiming the highest exhibition of morality and integrity; a volunteer, if you please, but still professing to act not for himself, but for others who had placed their confidence in him. In equity he was disabled from dealing in the matter of his agency, on his own account, 1 Leading Cases in Eq. (*White* v. *Tudor's*) 75, and the agency being established, he will be compelled to transfer the benefit of his contract, although he may swear he purchased on his own account. 1 Sug. on Vend., 51.

We have no hesitation in saying, that McCagg occupied such a position toward the parties, as to forbid him turning to his own advantage any of the accidents of the case he had undertaken to manage and conduct. The policy of the law, from its earliest records, has been to set its face most sternly against such conduct, and to deprive a party from reaping the least benefit from its results. The rule is well established, that trustees and others, sustaining a fiduciary and confidential relation, cannot deal on their own account with the thing or the persons falling within that trust or relationship. This rule is applied to all persons in whom there is a trust and confidence reposed, which would bring in conflict the interest of the trustee and *cestui que trust*. *Davoue* v. *Fanning*, 2 Johns. Ch. 261. The temptation of self interest is too powerful and insinuating to be trusted; and it must be removed by taking away the right to hold the property purchased. *Thorp et al.* v. *McCullum et al.*, 1 Gilm. 626 ; *Switzer et al.* v. *Skiles et al.*, 3 id. 529.

Where, as in this case, there is a voluntary assumption of an agency, the rule is the same, and is elaborately discussed and explained in the case of *Casey* v. *Casey*, 14 Ill. 112, to which reference is made, in support of the view we have taken of this case. The payment of this money by McCagg we must hold, under the proofs in the record, was in virtue of his assumed agency, and for the benefit of the complainants, whose trustee he made himself. There can be no escape from this conclusion.

The subsequent purchase from the complainants, or a part of them, by McCagg, of the land in controversy, was made of them in ignorance of their rights, and which had become perfect by the payment of the decree, and of which the knowledge was concealed. They have never, with a knowledge of their rights, which McCagg alone possessed, parted with their interest in this property, and they must be restored to it. Such is the dictate of justice and equity. It is insisted by McCagg, that they had no rights to this land, or any equity in it, as time was of the essence of their contract, and they had forfeited the contract by non-performance. This might have been so, but when they were impleaded by Cornell in chan-

Dennis et al. *v.* McCagg et al.

cery, they were rehabilitated to all their rights, and time given them, by a decree of the court, to perform the contract which had not expired, when McCagg, as their agent, interfered for them and completely reinstated them.

His purchase from them, without informing them of the payment of the redemption money, was a suppression of a fact they were entitled to know from him, and which, if known, it is not at all probable they would have accepted the trifling sum paid them. The very fact of his purchase from them, if he believed he had purchased the entire right from Cornell, as he claims he did, bears upon its face a bad appearance. Why should he take the trouble to hunt up these heirs, separated as they were, procure deeds from them, and pay them money, when all their rights had been forfeited, and his own title was perfect by the purchase from Cornell? Was it, could it be, a genuine impulse which prompted him, or may it not, most reasonably, be referred to the fact that they were poor and ignorant, and would never, probably, cause the transaction to be overhauled, and get the knowledge that they were reinstated in their rights by the payment of the redemption money?

As to the other defendants, who are innocent purchasers of this land, without notice of any equities or claims of complainants, and who have paid a valuable consideration therefor, they must be secure in their title, and cannot be disturbed by any decree we can pass; but it is in our power to compel the principal defendant, McCagg, to indemnify the complainants for the loss and injury they have sustained by his having placed the title beyond their reach, either by requiring him to pay over the purchase-money he received for the land, with interest thereon, or the present value of the land, as may seem most equitable. To enable this to be done, it becomes necessary a reference should be made to the master in chancery, to ascertain the facts, and for this purpose the decree is reversed, and the suit remanded to the Circuit Court, with instructions to enter a decree for complainants, and for further proceedings consistent with this opinion.

*Decree reversed.*