## FORLAW et al. v. AUGUSTA NAVAL STORES COMPANY. AUGUSTA NAVAL STORES COMPANY v. YOUNG.

1. Under the evidence in this case, the question of domicile raised by the
   plea to the jurisdiction was one of fact, and it was properly submitted
   to the jury for determination.

2. In the absence of a proper written request to that effect, it is not error for a judge, in his charge upon the question of one's domicile, to fail to draw the distinction between "actual residence" and "legal residence."

3. As the jury was to determine the question of fact as to whether the defendant had a family, and there was some evidence to show that the defendant's business caused a frequent change of residence, there was no error in giving in charge to the jury sections 1824 and 1825 of the Civil Code.

4. The court properly refused a written request to give a charge which assumed that there was no dispute as to an issuable fact.

5. There was evidence warranting the jury to return the verdict as made by them, and the court did not err in refusing to grant a new trial upon the issue raised by the plea to the jurisdiction.

6. The relation of principal and agent is a fiduciary one, and the latter can not make advantage and profit for himself out of the relationship, or out of knowledge thus obtained, to the injury of his principal; and the agency being established, the agent will be held to be a trustee as to any profits, advantages, rights, or privileges under any contract made and obtained within the scope and by reason of such agency, and he will be compelled to transfer to the principal the benefit of his contract upon repayment to him of such sums as he may have expended in consideration of the same.

7. As to one of the defendants, it does not appear that he acted other than as agent for a codefendant, and there being nothing clearly and distinctly alleged to show mala fides on his part, nor any allegation showing that he participated in the profits arising from the alleged fraudulent scheme or conspiracy, his demurrer wherein he contended that the petition did not set out any cause of action against him was properly sustained.

Argued October 11,—Decided November 13, 1905.

Equitable petition. Before Judge Hammond. Richmond superior court. July 21, 1905.

The Augusta Naval Stores Company, a partnership composed of Hogan and Heath, filed an equitable petition against D. J. Forlaw, Frank D. Christie, the Woodward Lumber Company, and the Ellis-Young Company, alleging in substance as follows: The petitioners formed a partnership for the purpose of conducting a turpentine business. For this purpose they acquired leases to about 3,713 acres of land in the county of Richmond, and in order to obtain such leases they had to pay the owners of the properties partly in cash and the balance out of the profits of the business. To make the cash payments they borrowed money from the Ellis-Young Company, a corporation of Savannah, and transferred to said company the leases as security. "Said leases thus obtained were of the value of twenty-five hundred dollars, . . and said company advanced the necessary money to make the payment called for thereby," which

amounted to about eight hundred dollars. Petitioners took possession of the tracts of land, and by their agents are still in possession thereof. Sometime subsequent to this transaction petitioners entered into an agreement with the Woodward Lumber Company, under the terms of which the Lumber Company agreed to lease to petitioners the turpentine privileges on what is known as the Cashin mill tract, containing 2,000 acres, for $6,000, cash, and one half of the net profits realized on said tract, which were to be ascertained by making certain deductions and allowances and then dividing the profits according to the agreed stipulations. Petitioners went into possession of the Cashin mill tract and commenced operations thereon. This lease covered a period of three years. Thereafter, pursuant to an agreement with the Ellis-Young Company, petitioners drew on them for $6,000, attaching to the lease a transfer thereof to the Ellis-Young Company. Petitioners based their authority for drawing on the Ellis-Young Company upon the following letter which was received from said Ellis-Young Company shortly after the first draft: "Yours of 20th at hand, with leases, which seem to be in order. Your drafts will be paid as advised. When you need anything in the way of axes or other tools, let us know." The Ellis-Young Company, instead of paying said draft of $6,000, telegraphed petitioners to "hold draft until papers could be examined and Wade conferred with," Wade being the agent or inspector of the Ellis-Young Company, who had examined the properties covered by the lease. The matter was suspended until the arrival of J. R. Young, agent of the Ellis-Young Company, "who brought with him one D. J. Forlaw." These persons caused the title to the property to be examined, and inspected the property, "and expressed themselves as more than pleased with the turpentine privileges thus obtained by petitioners, but objected to the arrangement whereby the Woodward Lumber Company should share in the net profits made by petitioners in said turpentine business on said property;" whereupon petitioners agreed to make any reasonable change in the contract desired by the Ellis-Young Company. Said Young as agent, as aforesaid, and said Forlaw proposed to petitioners, that, instead of conducting the business in the form of a partnership, it would be best to immediately form a corporation to be known as the "Augusta Naval Stores Company" with a capital stock of $7,500, which amount the Ellis-Young Company would

lend to the new corporation, the stockholders of which should be as follows: Young, owning one third; Forlaw, owning one third; and petitioners, owning one sixth each; and that this corporation should own all of the leases that had theretofore been transferred by petitioners to the Ellis-Young Company for advances theretofore made, amounting to about $800, and also the lease on the Cashin mill tract. Young and Forlaw further proposed to petitioners that the capital stock to be owned by petitioners in the new corporation could be obtained from the Ellis-Young Company and paid for out of the profits of the business, "petitioner Heath's firm (Heath & Cooper) in the meantime to sell goods to the company and the hands working for the turpentine farms, acting as commissary; and petitioner Hogan to be paid, in addition to the stock aforesaid, the sum of $500 for his services up to that time in obtaining said turpentine privileges." Forlaw was to get a salary to superintend the farms, Hogan to be employed to assist Forlaw when found to be necessary. Said Young stated that rather than have the Woodward Lumber Company interested in the profits of the business, his company would be willing to pay the Woodward Lumber Company more money than the $6,000. Relying upon these propositions and believing that they would be carried out in good faith, petitioners agreed thereto and thereupon opened negotiations with the Woodward Lumber Company, through Forlaw, which resulted in another agreement being reached under the terms of which the Woodward Lumber Company agreed to waive all of its interest in the net profits and to sell the turpentine privileges in said Cashin mill tract for the sum of $10,000, $5,000 cash, and $5,000 in twelve months. Forlaw then drew two drafts upon the Ellis-Young Company, one sight draft for $5,000, which was paid, and one for $5,000 payable one year after date, which was accepted by said Ellis-Young Company, the lease from the Woodward Lumber Company being transferred to the Ellis-Young Company as security for the $10,000. "That during all this time, from November, 1903, down to the present time (being since the time when petitioners brought from Screven County fifteen negro hands and put them to work upon the turpentine farms hereinbefore referred to), said work has been going on, has been conducted in the name of petitioners, petitioners being in possession of said property, both of the 3,713 acres, and also of the said 2,000 acres of the Cashin mill tract. That since January 9,

1904, petitioners, under the promise aforesaid, have been expecting the said parties, Forlaw, Young, and the Ellis-Young Company, to proceed with the corporation agreed upon, and have allowed the said Forlaw to go upon the turpentine farms aforesaid and supervise the same, they also being still under the control of one Frank D. Christie, who was put in charge by petitioners when the work first started." Forlaw, Young, and the Ellis-Young Company refused to pay petitioner Heath the $500 as agreed, paying him only $300, and refused to fulfil said contract made with petitioners and to recognize their rights in said property, and their refusal so to do was a breach of the contract which released petitioners therefrom. Moreover this breach was the part of a fraudulent scheme on the part of defendants, except the Woodward Lumber Company and Christie, to get control of the turpentine privileges aforesaid. Petitioners have made demand upon Forlaw to discontinue his control over said property and all further operations on the same, as well as to cease his supervision of the employees and Christie; but to no avail. Petitioners have tendered, and continue to tender, to Forlaw, Young, and the Ellis-Young Company all moneys heretofore advanced to them by said defendants, and demanded a reconveyance of the leases heretofore described; but defendants would neither accept the tender nor comply with their demand. Forlaw, Young, and the Ellis-Young Company obtained said original leases under their contract with petitioners to act as factors, and defendants can not change their status toward petitioners without petitioners' consent. Defendants occupy a trust relation with petitioners, which they have abused; and by their propositions as aforesaid they have imposed upon petitioners' confidence and induced them to act contrary to their interests. The defendants, with the exception of the Woodward Lumber Company, are joint trespassers upon petitioners' property, and their continuing to supervise the operations of the property is a daily trespass and damage to petitioners, which is irreparable and can not be measured in damages. Forlaw is insolvent, and his claim to own the lease interest from the Woodward Lumber Company is a cloud upon petitioners' title. The Woodward Lumber Company refuses to recognize petitioners as the owners of the lease executed by it to Forlaw, although in equity petitioners are the owners of said lease; but the Woodward Lumber Company claims in no way to be bound by the fraudulent imposition put upon peti-

tioners by Forlaw, Young, and the Ellis-Young Company. Christie, whom petitioners put in charge of said property and who is still in possession and control as the agent of petitioners, claims to be uncertain as to his duty and status, saying that he does not know whose orders to obey, whether to obey Forlaw or to carry out the commands of petitioners; and he refuses to recognize the rights of petitioners, thereby becoming a joint trespasser with Forlaw. He is insolvent. Owing to this condition of affairs the work is not progressing as it should, and, if continued, will result in great damage to petitioners. They pray that a receiver be appointed to take charge of the properties; that Forlaw and Christie be enjoined from further interfering therewith in any way; that Forlaw, Young, and the Ellis-Young Company be required to transfer back to petitioners all of the leases obtained from petitioners; and general relief.

The petition was amended by the allegation that Forlaw and his associates had formed a corporation known as the "D. J. Forlaw Company," for the conduct of said turpentine business, without naming petitioners as incorporators, although petitioners had fully complied with their contract; and that the failure of the defendants to carry out their agreement has endamaged petitioners in the sum of ten thousand dollars; and they pray "that defendants be required to account with petitioners as to the proceeds of the business done under said leases." Upon motion the Woodward Lumber Company and Christie were stricken as parties defendant; to which no exception was taken. Forlaw filed a plea to the jurisdiction, claiming Chatham county as his residence. The jury found against his plea. He made a motion for a new trial, upon the general grounds, and because the court erred in charging the jury that "if you find that Mr. Forlaw was a resident of Richmond county at that time, the form of your verdict will be, 'We, the jury, find that at the time this suit was filed D. J. Forlaw was a resident of Richmond county.' If you find that he was not a resident of this county at that time, the form of your verdict will be, 'We, the jury, find that D. J. Forlaw at the time this suit was filed was not a resident of Richmond county;'" the error being that the charge fails to draw the proper distinction between being a casual resident of a county and a legal resident. Error was alleged upon the following charge: "The domicile of every person of full age and laboring under no disability

is the place where the family of such person shall permanently re-side, if in this State. If he has no family, or they do not reside in this State, then the place where such person shall generally lodge shall be considered his domicile;" the error being in charging the jury at all as to where the domicile of a person is who has no family, the evidence being that Forlaw had three children all of whom were minors. Error was further assigned upon the following instruc-tions to the jury, as not being applicable to the facts of the case: "If a person shall reside indifferently at two or more places in this State, such person shall have the privilege of electing which shall be his domicile; and if such election be made notorious, the place of his choice shall be his domicile. If no such election is made, or, if made, is not generally known among those with whom he transacts business in this State, third persons may treat either one of such places as his domicile, and it shall be so held; and in all such cases a person who habitually resides a portion of the year in one county, and another portion in another, shall be deemed a resident of both, so far as to subject him to suits in either for contracts made, or torts committed in such county." "Transient persons whose busi-ness or pleasure causes a frequent change of residence, and having no family permanently residing at one place in this State, shall be held and deemed, as to third persons, to be domiciled at such place as they at the time temporarily occupy." Error was also assigned because the court refused a request to give in charge the following: "There being no dispute as to the fact that D. J. Forlaw has a family of which he was the legal head, the only question of fact for you to determine under this plea is as to the place where the family resided at the time of the service of the writ." The court overruled the motion for a new trial, and Forlaw excepted.

The evidence as to the question of jurisdiction was practically as follows: Forlaw is a widower with three minor children. During a portion of the year two of his children are away, in Milledgeville, at school. He considered Savannah his home, and for two years his children had been living there at the home of his brother-in-law, as aforesaid. When he went to Savannah he carried his household goods, and there they have remained in the house occupied by his children. He is a turpentine prospector, and that carries him away from home most of his time. During the two years preceding the trial he had spent portions of his time in different places in Florida,

Georgia, and South Carolina. He usually went to Savannah three times a week to see his children. While in Savannah he did not always stay at the house of his brother-in-law, but sometimes stayed at a hotel. He did not return his taxes in Savannah, but paid them after this suit had commenced, for the current year and the year preceding. "I went to Savannah two years ago," he testified, "intending to make that my home, and did make it my home. I have never changed that intention." He communicated this intention to W. H. Fleming prior to the filing of the suit, who testified that he notified counsel for the plaintiffs that Forlaw was not a resident of Richmond county before these legal proceedings were commenced. , Counsel for plaintiffs acknowledged being so notified by Fleming, but said, "I remember the conversation, but don't think it occurred before we filed the suit." Forlaw had lived in Richmond county about two months before the suit was filed, spending his time at a turpentine camp which he referred to as "home." He brought bedclothes and other necessities with him when he came to Richmond county, with which he fitted up his "shanty" at the camp. At the time of the trial he had been in Richmond county about nine months during which time he had made five or six trips to Savannah. Forlaw and the Ellis-Young Company filed demurrers to the petition, upon the following grounds: (1) The petition does not set forth a cause of action against "this defendant." (2, 3) The contract of lease set forth in the petition is void, for the reason that it was not in writing and was not to be performed within a year from its date, and there has been no such part performance as to take it out of the statute of frauds. (4, 5) Defendants made no valid and binding contract for the formation of the corporation named in the petition; and Forlaw made the lease from the Woodward Lumber Company not as the agent of petitioners, but in his own name. The court overruled these demurrers, and the defendants excepted. Young also demurred upon the ground that the petition set forth no cause of action against him, as it appeared that he acted only as agent and not individually. His demurrer was sustained, and the plaintiffs excepted.

*W. H. Fleming,* for Forlaw et al.    *W. K. Miller,* contra.

BECK, J. (After stating the facts.) 1. If the three minor children of the plaintiff in error, Forlaw, had resided permanently

under a roof which he had provided and under which he himself lodged when on his visits to them, we might have been able to hold as a matter of law that even though the greater part, or practically all, of his time was passed at other places in other counties or in other States, he had a family. · But that is not the case presented by the record in the cause arising out of the issue made by the plea to the jurisdiction. "A family is defined as a collective body of persons who form one household, under one head and one domestic government, including parents, children, and servants, and, as sometimes used, even lodgers or boarders." 12 Am. & Eng. Enc. L. (2d ed.) 866. Again, "A family is a collective body of persons who live in one house and under one manager." Webster's Dictionary. And again, "Parents with their children, whether they dwell together or not; . . in a narrow use the children of the same parents, considered collectively or apart from the parents." Century Dictionary. "In a broad sense the word 'family' may include all the person's children, whether living with him or not, and even their relatives; but in a more limited sense it includes only those living together as one household." Hart v. Goldsmith, 57 Conn. 479. " 'Family' is defined as, 1. Persons who collectively live together in a house or under one head; a household. 2. Those who are of the same lineage, or who are descended from one common progenitor; a race or tribe; a house." Peeler v. Peeler, 68 Miss. 141. The word "family" has no one fixed, technical definition. Its meaning varies very greatly according to the subject of the law in which it is used; it varies in different statutes, and has received various definitions in different jurisdictions, even in the interpretation of statutes substantially identical. The very extensive range of these definitions is well illustrated in the numerous citations of authorities given under the first definition of the subject, from the American & English Encyclopædia of Law, above quoted. It follows that the meaning of the word "family" in the section of the code defining domicile is not necessarily identical with the meaning of the same word as used in the homestead and exemption laws; and we find still further variations of its meaning when we pursue it to criminal laws and police regulations. See Goode v. State, 16 Tex. 414; Bones v. State (Ala.), 23 So. 485. Without attempting to select from the numerous definitions of the word "family" one that would be so comprehensive and general as

to be applicable in all cases, we think that no definition of the word as used in the Civil Code, § 1824, would be acceptable or satisfactory that does not convey the idea of unity of the household in which are gathered the members of the family as one collective body under the management or control of the head thereof, or to which the head of the family, though called away by the demands of business for periods of longer or shorter duration, constantly returns or expects to return.     There was evidence in the case at bar from which the jury would have been authorized to find that Forlaw was, in this sense of the word, the head of a family.     And as we view the case, the preponderance of the evidence was in support of his contention on this point.     But there was evidence to the contrary, which authorized a different finding.     From Forlaw's own testimony we are left in doubt as to the terms upon which his children were living with the brother-in-law when they were in the latter's house.     His son was "there all the time," whether as a boarder or as a member of the brother-in-law's household the record is silent.     His daughters "are there when they are through with school," but how much time they spend at school as compared with the duration of their stay under the brother-in-law's roof we are left to conjecture.     His household goods and furniture were also at his brother-in-law's, but whether in use as the furniture in any particular room, or whether stored away in the house, we have no means of discovering.     The defendant whose domicile is in question had not paid taxes in Chatham county, not even a poll tax, nor had he returned any property for taxation in that county until after this suit was filed against him and his codefendants.     When he visited his family in the city of Savannah he stayed at a hotel when he did not stay at the place with his children; but what proportion of this time when in Savannah he spent at the latter place, and what at the hotel, we are again left to infer from indefinite and very general statements.     As was pertinently suggested in argument here, in the event suit against Forlaw had been brought in Chatham county and it had been desired to serve the writ upon him at his "most notorious place of abode," should it have been left at the residence of his brother-in-law or at the hotel where he frequently lodged?     Or again, suppose that one of his children had resided permanently in Chatham county and the other two in Baldwin while he was sojourning in Richmond, where would his domicile have been?     That would be determined from intention,

declarations, and acts, making it a fact to be determined by the jury under the instructions of the court, and not by the court as a matter of law. "The existence or nonexistence of a domicile in a given locality, where the facts are conflicting, is a mixed question of law and fact. So far as it involves questions of fact, including the ascertainment of the intention of the party, it is solely within the province of the jury, whose determination is conclusive, unless the verdict is set aside as having been against the evidence. . . And generally speaking, the question of what should be considered the domicile of a party is in all cases rather a question of fact than of law." 9 Cyc. 865. What we have ruled touching the meaning of the word "family" is altogether in reference to the sense in which it is used in the Civil Code, §1824, defining domicile. In other connections the word might have a broader, or a more limited, or a more technical meaning; as, for instance, in the laws relating to homestead and exemptions. *Rountree v. Dennard, 59 Ga.* 629. See also *Fulghum v. Strickland, 123 Ga. 258.*

From what we have said above, the conclusions reached in head-notes 2, 3, 4, and 5 necessarily follow.

6. This case is clearly within the fundamental equitable principle laid down in the sixth headnote. It is true that Forlaw was not nominally the agent of the plaintiffs in this case. He was the agent of the Ellis-Young Company, who were the factors of the plaintiffs; but he brought himself within confidential relations of a fiduciary character with Heath and Hogan when he and Young, by advising with the former and suggesting material changes in the terms of the lease which had been contracted for with the Woodward Lumber Company, induced them to waive their (plaintiff's) interest and right in the turpentine privileges in the Cashin mill tract so that a new lease might be obtained from the lumber company of the turpentine privileges on this valuable tract of land. It is true that Forlaw took the lease from the lumber company to himself individually, but this was under an agreement and understanding between him and the plaintiffs, according to which a corporation should be formed and a one-third interest of the stock thereof taken by Heath and Hogan, the Ellis-Young Company furnishing them the money with which to pay for the same. So the new lease of the mill tract, whether Heath and Hogan, or the Ellis-Young Company, or Forlaw were named therein as lessees, was for the benefit

of the corporation which was to be created—that is, for the benefit of the incorporators, two of whom were, under the stipulations set forth in the petition, to be these plaintiffs. When Forlaw went to the Woodward Lumber Company to secure the new lease, he went armed with knowledge, with authority, with power that he had acquired because of the confidential relations into which he had been brought with the two men who are now seeking equitable relief. The plaintiffs themselves, through Forlaw, had opened negotiations with the Woodward Lumber Company, which resulted in an agreement being reached whereby the lumber company agreed to sell the entire turpentine privileges on the Cashin mill tract for a fixed sum, waiving its rights to a part of the profits arising from the business which had been stipulated for in the first contract. The lease to Forlaw could not have been obtained but for the agreement and consent of the plaintiffs that it should be made; nor that agreement and consent had but for the confidence reposed by the plaintiffs in Young and Forlaw. The latter and certain named associates, neither of whom was Heath or Hogan, proceeded to secure a charter for a corporation under the name of the "D. J. Forlaw Company," but with the identical object and the same rights, powers, and privileges as had been contemplated for the corporation agreed upon between himself, Young, and the plaintiffs. To rule that the Ellis-Young Company was to be permitted to hold the leases assigned to it to the turpentine privileges in the 3,713 acres and the lease to the Cashin mill tract, executed to Forlaw and assigned by him to the Ellis-Young Company, would be a holding at variance with the doctrine established by numerous authorities, and it would be unsupported by any authority to which our attention has been directed. The safe principle and sound, under the facts of a case like this, seems to be one announced in the American note to Keech *v.* Sandford, 1 Lead. Cas. Eq. 53, where it was thus forcibly and comprehensibly expressed: "Wherever one person is placed in such relation to another, by the act or consent of that other, or the act of a third person, or of the law, that he becomes interested for him, or interested with him, in any subject of property or business, he is prohibited from acquiring rights in that subject antagonistic to the person with whose interests he has become associated." And in the case of Conant *v.* Riseborough, 129 Ill. 391, it was said: "The principles applicable to the facts of this case are well settled by the

authorities. 'If confidence is reposed, it must be faithfully acted upon and preserved from any intermixture of imposition. If influence is acquired, it must be kept free from the taint of selfish interest and cunning and overreaching bargains.' (1 Story's Eq. Jur. §308.) Where a person is intrusted as a confidential agent with the conduct of business where he professes not to act for himself, but for others who have placed their confidence in him, he is disabled in equity, even though he may be a volunteer, from dealing in the matter of his agency on his own account. 'The agency being established, he will be compelled to transfer the benefit of his contract, although he may swear that he purchased on his own account.' (Dennis v. McCagg, 32 Ill. 429.) The rule applies not only to persons standing in a direct fiduciary relation towards others, but also to those who occupy any position out of which a similar duty ought, in equity and good morals, to arise. No party can be permitted to purchase an interest when he has a duty to perform which is inconsistent with the character of a purchaser. (Davis v. Hamlin, 108 Ill. 39; Vallette v. Tedens, 122 Id. 607.)" And the facts demanding the application of these rules and principles, the statute of frauds can not be invoked to prevent it. If the allegations of the equitable petition in this action are true (and they are to be taken as true as against the demurrer), the Ellis-Young Company, the factors of plaintiffs, stand in a fiduciary relation to them, and, if the fraud and conspiracy alleged can be proved, are trustees ex malificio; and the same is true of Forlaw, in whose name the lease from the Woodward Lumber Company was executed, should the same charges be established by the evidence. In another well-reasoned opinion from the court last quoted, we have the following ruling which strengthens the conclusion we have reached in the case at bar. "Where a confidential agent of one having a lease of a theater, who, from his position, was well acquainted with the profits of his principal in the use of the building, and who knew, some months before the old lease expired, that the latter was desirous of renewing his lease, offered privately to lease the theatre of the owner, proposing to give a larger rental than was reserved in the old lease, and denied to his principal that he was competing with him for the lease, but in fact did procure a lease to be made to himself, it was *held*, that the benefit of such lease a court of equity would hold to inure to his principal, and that the agent would be held to hold the

18

same as trustee for his principal." Davis *v.* Hamlin, cited supra. It was contended by counsel for the losing party in that case that the rule which the court applied, which holds an agent to be a trustee for his principal, had no particular application to the case, because Davis, the agent, was not an agent to obtain a renewal of the lease and was not charged with any duty in regard thereto; that his was but the specific employment to engage amusements for the theatre, and that he was only an agent within the scope of that employment; that Hamlin, having a lease which would expire on a certain date, had no right or interest in the property thereafter, and that Davis "in negotiating for the lease did not deal with any property wherein he had an interest, and that the leased property was not the subject-matter of any trust between them." It was further argued that the relation there between Hamlin and Davis was only one of master and servant or of employer and employee, and that the rule had never been applied to that relation as a class, "that the classes coming within that doctrine are embraced within the list of defined confidential relations, such as trustee and beneficiary, guardian and ward, etc." But the court replied that the subject was not comprehended within any such narrowness of view, but that in applying the rule it is the nature of the relation which is to be regarded, and not the designation of the man filling the relation. Or, as clearly expressed in an elementary work on equity, "The rule under discussion applies not only to persons standing in a direct fiduciary relation towards others, such as trustees, executors, attorneys, and agents, but also to those who occupy every position out of which a similar duty, in equity and good morals, ought to arise." Bisp. Eq. § 93. See also *Fricker* v. *Americus Mfg. Co.,* ante, 165. And we have no hesitancy in affirming the judgment overruling the demurrers of Forlaw and the Ellis-Young Company.

6. As to J. R. Young, since it does not appear that he acted other than as agent for the Ellis-Young Company; and there being nothing clearly and distinctly alleged to show mala fides on his part, nor any allegation showing that he participated in the profits arising from the fraudulent scheme or conspiracy, his demurrer was properly sustained.

*Judgment in each case affirmed.    All the Justices concur.*