FREDERIKA ACHILLES *et al.*

*v.*

SARAH A. ACHILLES.

*Filed at Springfield May 11, 1891.*

1. ANTE-NUPTIAL CONTRACT—*when set aside—fraud in obtaining.* The parties to an ante-nuptial contract, after betrothal, stand in a confidential relation to each other, which requires good faith and a full disclosure of their means, etc., and the absence of any unreasonable and harsh provisions. The want of good faith on the part of one of the parties will justify the setting aside of such an agreement.

2. Where, after a short negotiation, an ante-nuptial contract and an agreement for marriage were entered into at the same time, and it appeared from the evidence that the woman did not rely upon the statements of the intended husband, but acted upon the investigation and advice of her son, a mature and experienced business man, and the evidence failed to show, by a preponderance, that the husband misrepresented the property which he owned or was guilty of deception or other unfair practices, it was *held,* that the wife, surviving her husband, was not entitled to have the ante-nuptial contract set aside, and be allowed to take as widow and heir what she would have taken but for such contract.

3. SAME—*bill to set aside—right of heirs to defend—specific enforcement.* The general rule of equity, that ante-nuptial contracts will not be specifically enforced at the instance of mere volunteers, has no application to a bill by a widow of a person dying without issue, against his heirs-at-law, for partition of lands left by him, in which she seeks to set aside the marriage agreement, so that she may take half of the land and dower in the remainder, instead of nothing. In such case the heirs are but defending to protect their legal estate.

4. It is a well-known exception to the rule above stated, that when the bill is brought by persons who are within the scope of the marriage consideration, equity will decree a specific execution of the marriage

articles throughout, as well in favor of mere volunteers as of the complainants in the suit.

5. SAME—*whether homestead right barred.* The homestead right of a widow, as the survivor of her husband, can not be barred by an antenuptial contract.

6. WITNESS—*on bill to set aside ante-nuptial contract—widow not a competent witness.* On bill by a widow to set aside an ante-nuptial contract which debars her of all interest in the estate of the intended husband, as heir or as widow, and for partition of the lands left by him, she is not a competent witness to prove matters in avoidance of the contract, on her own motion, as against the heirs-at-law of the deceased husband.

7. EVIDENCE—*deposition—whether excluding examination in chief excludes cross-examination.* Where a deposition is taken of a party incompetent to testify, on the ground of interest, and an objection is interposed to the competency, which is noted by the officer taking the deposition, and the party objecting cross-examines the witness, and on his motion the deposition is excluded by the court, the other party will not have the right to read, on the hearing, the cross-examination. By cross-examining an incompetent witness before the court passes on an objection to the competency, the party so cross-examining does not make the matters drawn out by his examination competent evidence against him.

8. A party defending as heir of a deceased person, who, after objecting to the competency of the adverse party as a witness in her own behalf, on her examination before the master in chancery proceeds to cross-examine her, does not thereby waive the right to have the whole of her testimony excluded by the court on the hearing, as the master does not pass upon objections to the competency of a witness, but leaves them to be decided by the court.

APPEAL from the Circuit Court of Sangamon county; the Hon. JAMES A. CREIGHTON, Judge, presiding.

Mr. J. G. KŒSTER, for the appellants:

The alleged misrepresentations were not made to the son, and by him communicated to appellee, until after she had made up her mind on the subject from information obtained from other sources.

Appellee's allegation in her bill that she was entirely ignorant of the extent and great value of his estate is disproved by the testimony.

The provisions made for appellee were adequate to maintain her in the same way of living that she had been accustomed to before the marriage, and that without reference to her own means.

A marriage contract does not differ in principle from other species of contracts where mutual and concurrent acts are to be performed. *Burk* v. *Shaine,* 2 Bibb, 341; *Tiernan* v. *Binns,* 92 Pa. St. 248; *Jacobs* v. *Jacobs,* 42 Iowa, 600; *Gause* v. *Hale,* 9 Ired. Eq. 241; *Phelps* v. *Phelps,* 72 Ill. 545; *McGee* v. *McGee,* 91 id. 548.

We maintain that where, in an ante-nuptial contract, a homestead is provided, there being no minor children, the homestead, under the statute, is barred. *Hathaway* v. *Hathaway,* 46 Vt. 234; *Shaffer* v. *Matthews,* 77 Ind. 83; *Desneyer* v. *Jordan,* 27 Minn. 295; *Stunz* v. *Stunz,* 131 Ill. 210; *Hafer* v. *Hafer,* (Kan.) 13 P. 821.

Messrs. PATTON & HAMILTON, for the appellee: .

Owing to the confidential relations of the parties, the utmost good faith is required to uphold ante-nuptial contracts. There must be no secrecy or fraudulent representations. *Kline* v. *Kline,* 57 Pa. St. 120; Story's Eq. Jur. secs. 215, 267; *Kline's Estate,* 54 Pa. St. 122; *Bieser's Appeal,* 92 id. 266; *Pierce* v. *Pierce,* 71 N. Y. 154; 14 Am. and Eng. Ency. of Law, 546; *Sears* v. *Shafer,* 6 N. Y. 268; *Nesbit* v. *Lockman,* 34 id. 167; *Storrs* v. *Scougale,* 48 Mich. 387; *Woodbury* v. *Woodbury,* 141 Mass. 329; *Staley* v. *Dodge,* 50 Ill. 43; *Trotter* v. *Smith,* 59 id. 240; *Rockafellow* v. *Newcomb,* 57 id. 186.

Mrs. Achilles was incompetent as a witness only when called in her own behalf, but she was clearly competent when called or examined by the appellants. Rev. Stat. chap. 51, sec. 1; *Stevens* v. *Brown,* 12 Bradw. 619; *Capen* v. *Glass Co.* 105 Ill. 185; *Adams* v. *Russell,* 85 id. 286.

Mr. S. S. GILBERT, for the appellees Rothenbucher *et al.*

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

This is a bill filed at the May term, 1890, in the Circuit Court of Sangamon County by the appellee, as the widow of Louis Achilles, deceased, against appellants, as the heirs of said Louis, for the purpose of setting aside an ante-nuptial agreement between the appellee and her deceased husband, and also for partition and for assignment of dower and homestead. The Court below held the agreement void for fraud, and decreed accordingly. From such decree the present appeal is prosecuted.

The deceased was a widower, 77 years old, when the agreement was made, and had no children at that time, nor when he died. The appellants are his sisters and nephews and nieces. The appellee was a widow, named Sarah A. Wineman, and was 64 years of age when the agreement was made. She had one son by her first husband, an only child named Charles H. Wineman, 35 years old and in business for himself. The ante-nuptial agreement bears date January 4, 1884, and was recorded in Macoupin County on January 6, 1886. The marriage took place on January 7, 1886. The deceased had made a will on October 3, 1884, which was revoked by the subsequent marriage; he lived with appellee as his wife until February 3, 1890, when he died without having made another will, and leaving appellee, his widow, and appellants, his only heirs at law. When the marriage took place and prior thereto, the deceased lived in Carlinville, and appellee in Virden, and Charles H. Wineman in Auburn. After the marriage Mr. & Mrs. Achilles lived in Carlinville, in the upper story of the building owned by him and hereafter referred to, for about two years, when he bought a piece of property in Auburn, and they went to the latter place to live.

At the time of the marriage the deceased owned the building in Carlinville mentioned in the agreement, worth $3500.00; a farm near Carlinville worth $4000.00; other property in

Carlinville worth $1500.00; Missouri land worth $3000.00; the house and lot in Virden mentioned in the agreement, worth $500.00; personal property and good notes and bonds worth from $8000.00 to $10,500.00. The homestead property in Auburn, bought after the marriage, and in which Louis Achilles and his wife lived for two years, and were living when he died, was worth $2500.00. At the time of the marriage, appellee had dower in 500 acres of land, yielding her, after paying taxes, an income of from $500.00 to $700.00 a year; She was boarding in Virden and paying about $3.00 per week for board.

The ante-nuptial agreement provided, that, during the married life of the parties, all their property, real and personal, which they then had or might acquire in the future, should be held severally, and not jointly, and each one should exercise full control over his or her individual estate; that, upon the death of either, the survivor should not inherit any of the property of the deceased, or have any interest whatever in it, except as provided in said contract, but said property should descend to the other heirs of the deceased; that all individual expenses, such as clothing, traveling expenses, etc., should be paid by the party contracting such indebtedness out of his or her individual estate; that, should Louis Achilles die before Mrs. Wineman, she should have, as long as she remained his widow, the free use either of the upper story of his brick building in Carlinville, or the upper story of his frame house near the depot in Virden, with one half of the lots on which the house was standing, for use as a garden or yard room, and should also receive, as long as she remained his widow, $200.00 per annum, payable semi-annually out of his estate.

The alleged ground, upon which it is sought to set aside this agreement, is that the appellee was induced to enter into it by the fraudulent representations of the deceased as to the extent and value of his estate. It is charged, that he represented to the appellee, that he owned nothing but the brick.

building and the frame house mentioned in the contract, worth only about $4000.00, when as matter of fact he owned other property, as above described, to the amount of about $19,-000.00 or $20,000.00. Whether the deceased did or did not make such misrepresentations as are charged against him, and whether or not the appellee was induced thereby to sign the agreement, are questions of fact, and before noticing the evidence, it becomes necessary to dispose of a preliminary question as to the admissibility of certain testimony given by Mrs. Achilles.

The cause had been referred to a Master to take proof. The complainant below, who is the appellee here, offered herself as a witness before the Master, and the defendants objected to her examination on the ground that she was not a competent witness; but the examination was allowed to proceed, and she was examined in chief in her own behalf, and the defendants then cross-examined her. Upon the hearing, the defendants made a motion to exclude her testimony as thus taken before the Master, which motion was sustained by the court, and no exception was taken by the complainant to such ruling. The testimony was properly excluded by the trial court. Mrs. Achilles was a party to the suit, and the defendants were adverse parties defending as the heirs of a deceased person. She was, therefore, an incompetent witness under section 2 of chapter 51 of the Revised Statutes in regard to Evidence and depositions in civil cases.

But counsel for appellee claim, that, inasmuch as, by the terms of said section 2, a party to any civil action, or person directly interested in the event thereof, although the adverse party sues or defends as heir, may be called as a witness and be competent to testify as such *when called by such adverse party*, and inasmuch as the defendants, being the adverse party to Mrs. Achilles, cross-examined her, and called out, from her, testimony material to the issue, they thereby *called* her as a witness, and her cross-examination was thereby made

competent, and may be offered by either party. We do not think that the defendants waived their right to move to exclude the testimony upon the hearing, because they cross-examined the witness. The Master, to whom a reference is made to take proofs, does not pass upon objections to the competency of testimony. He merely notes the objections as made, and leaves their validity to be determined by the court. As the objecting party cannot know in advance what the decision of the court may be, a failure to cross-examine before the master may deprive him of the opportunity to do so if his objection is overruled. The case of *Capen* v. *DeSteiger Glass Co.* 105 Ill. 185, has no application here, because there a party was objecting to evidence called out upon his own cross-examination of a competent witness whose direct examination was unexceptionable.

Counsel claim that they had a right to offer the cross-examination upon the hearing. If this were so, they did not make any such offer. When the court sustained the motion to exclude the deposition, the whole of it—both the direct and cross-examination—was excluded. The cross-examination was not considered by the court, but the case was decided upon the other evidence. Because the deposition happens to be in the record, counsel ask this court to consider a cross-examination which was not taken into consideration by the court below. But it is not true, that complainant below had the right to read the cross-examination and have it considered, after the court had excluded the whole deposition on the ground of the incompetency of the witness testifying. The case of *Adams* v. *Russell*, 85 Ill. 286, does not sustain any such position; that case only decides, that, when one party has taken and filed a deposition, and does not withdraw it, and fails to read it, the other party may introduce it.

There is no evidence whatever that the deceased ever told appellee herself anything that was not true about his property. The representation, that he owned nothing but the Carlinville

building and the Virden house, is not claimed to have been made to her, but to her son. The latter, Charles H. Wineman, swears, that the deceased came to him at his residence in Auburn about January 1, 1886, and showed him the contract, which was not then signed; that his mother had spoken to witness before that date about getting married; that he had a conversation then and there with the deceased; that he had made up his mind not to oppose the marriage; that deceased then said his property "consisted of the Virden and Carlinville property," * * * and that "that was all the property he had; he said nothing about the farm near Carlinville;" that he, the witness, afterwards told his mother of this conversation with the deceased, and "what he said about the property he had."

This testimony of Charles H. Wineman is the only evidence in the record, that the deceased represented his estate to consist of the Carlinville and Virden property alone, and the representation, if made as claimed, was not made to appellee, but to her son and by her son communicated to her. Opposed to this is the testimony of two witnesses, Mrs. Martha N. Luth and Louis Kaufman. Mrs. Luth was a friend of "Captain" Achilles, as the deceased was called, and when the Captain told her that he was lonely and wanted a wife, she recommended Mrs. Wineman, telling him that she had but one child, who was married and "well off," and that she herself was able to take care of herself. He expressed a desire to make Mrs. Wineman's acquaintance. Shortly thereafter Mrs. Luth met Mrs. Wineman and informed her about Captain Achilles. Mrs. Luth swears, that, at the interview with Mrs. Wineman, she told her that the deceased had property in Virden and in Carlinville, and a farm not far from Carlinville, and that she had heard him say he had land in Missouri; that Mrs. Wineman asked how he made his living, and witness told her that he lived on the interest of his money.

Louis Kaufman, a friend of both parties, swears that the deceased, who was a German and could not write English, wrote him a letter, enclosing one written in German addressed to Mrs. Wineman, and asked him to translate the enclosed letter to Mrs. Wineman. Kaufman, who was a merchant in Virden, sent for Mrs. Wineman and translated this letter to her, writing out his translation of it. The letter is in evidence, and bears date December 17, 1885. In the letter he says nothing about property, but refers to what Mrs. Luth had told him of Mrs. Wineman, speaks of himself as "an entire stranger" to Mrs. Wineman, but refers to his good record as an old resident of Virden and as the husband of his former wife, and offers himself in marriage, suggesting a place where they should meet each other, if his offer should be favorably considered. Kaufman swears that, when Mrs. Wineman came to his store, he had an interview with her after the reading of this letter, and also had several other conversations with her when other letters were received; that she asked him in regard to Capt. Achilles' property, and he told her that the Captain owned property in Virden and in Carlinville, that he had "bonds, court house bonds or something of that sort," that he lived on the interest of his money, and had been so living in Germany and had come back to this country, and that he always told witness "he had enough laid by for a rainy day."

It is hardly possible that appellee could have been induced to believe, that the deceased owned nothing but the building in Carlinville and the house in Virden after the information she thus received from Mrs. Luth and Kaufman. At any rate, if her son told her what he claims to have told her, the difference between his statements and those of Mrs. Luth and Kaufman should have put her upon inquiry, and should have led her to suggest to her son to make inquiry as to the extent of the estate. Her son was her adviser, managed her dower estate, and collected her rents for her. At her request Captain Achilles went to her son to submit to him the marriage

contract, and to ask for his consent to the marriage. She was unwilling either to marry, or to sign the contract, until her son had been consulted.

The appellee was allowed by the court to testify in rebuttal as to her conversations with Mrs. Luth and Kaufman. She admits that these two witnesses talked to her about the property of the deceased, and told her of the houses in Virden and Carlinville, but she denies that they mentioned any other property. It is difficult to understand what possible motive Kaufman and Mrs. Luth, who are in no way interested in this controversy, could have had in representing the estate of the deceased to be less than they knew it to be. On the other hand, appellee has a deep interest in the result of this litigation. If the contract is set aside, she gets all the personal property, and one half of the land, and dower in the other half. Her age, at the time of her husband's death, was 68, and her son, as her only heir, will soon inherit her estate. For this reason he also is materially interested in the result of this suit. As against the contract itself and the evidence of two disinterested witnesses, the statements of the mother and son are not sufficient to sustain the decree of the court below.

It is strenuously urged upon our attention that, when this contract was signed, the deceased and appellee were betrothed, and that, therefore, he sustained towards her a confidential relation, and she cannot be regarded as having dealt at "arms length" with him, and was not required to exercise her judgment, or to seek information as to his property. We admit the correctness of the general rule, that the parties to an antenuptial contract stand in a confidential relation to each other, which requires good faith, and full disclosure, and the absence of unreasonable and harsh provisions. But in this case, the whole arrangement seems to have been of a purely business character. The parties had not known each other for more than three weeks before the marriage. Counsel for appellee

themselves contend, that there had been no betrothal, or agreement to marry, before the contract was signed. They say in their brief: "The negotiations were pending, but no agreement to marry had been made." The contract was not signed under the influence of the affection and confidence inspired by a marriage engagement. The deceased brought forward the contract and submitted it to the son before he or his mother had consented to a marriage. The ante-nuptial contract and the proposition to marry were presented simultaneously, and the latter was not accepted until the former had been agreed upon.

But even if appellee had agreed to marry the deceased before the terms of the contract were assented to, she did not rely on her own judgment. She relied upon the judgment of her son, who was an experienced business man. It cannot be said that she was prevailed upon by the love and confidence growing out of a marriage engagement to sign the contract, when she positively refused to sign it, until her son had examined it and had advised her in regard to it. Nor can it be said, that the free use of one of the houses named in the contract, and an annual income of $200.00 during the remainder of her life, was an unreasonably small provision for appellee, when, according to her own statement, she lived on $3.00 per week before her marriage. While the want of good faith will justify the setting aside of an ante-nuptial contract, the proof in this case does not, in our opinion, show a want of good faith.

Counsel for appellee invoke the general rule, that marriage articles will not be executed upon the application of mere volunteers, (2 Story's Eq. Jur. sec. 986,) and say that the appellants are mere volunteers. It is difficult to see how the rule has any application here. This is a bill for partition and for assignment of dower and homestead. Even if the marriage contract is set aside, appellants are the owners of one half of the property subject to dower. They are necessary parties to

the proceeding. They are not asking for a specific execution of the contract; the appellee is seeking to set aside the contract, and, they being brought into court, are resisting the annulment of the contract in support of their claim to the whole property. In partition suits, questions of controverted title are investigated and determined.

It is a well-known exception to the rule thus invoked, that, where the bill is brought by persons who are within the scope of the marriage consideration, equity will decree a specific execution of the marriage articles throughout, as well in favor of mere volunteers, as of the complainants in the suit. (Idem.) These articles provide that, upon the death of either party, the survivor shall not inherit, etc., but the "property shall descend to the other heirs of the deceased." The appellants are "the other heirs of the deceased." They are specially mentioned in the contract, a part of the consideration of which is that the property of the deceased, except as therein provided, shall descend to such heirs. They seem to come within the exception to the rule.

Appellants claim, that the decree is erroneous in ordering that a homestead be set apart to the complainant below in the lot in Auburn where she and her husband resided at the time of his decease. We do not think that the decree is erroneous in this regard. We have held that the homestead right cannot be barred by an ante-nuptial contract. (*McMahill* v. *McMahill*, 105 Ill. 596; *McGee* v. *McGee*, 91 id. 548.)

The decree of the Court below is reversed for the reasons here stated and in the respects here pointed out, and the cause is remanded to the Circuit Court for further proceedings in accordance with the views here expressed.

*Decree reversed.*