(No. 35534.—)
MATHILDE J. TURNER, Appellant, *vs.* BENJAMIN H. BLACK *et al.*, Appellees.

*Opinion filed March 31, 1960.—Rehearing denied May 16, 1960.*

GOLDBERG & LEVIN, and GEORGE P. BURGESS, both of Chicago, (MAYER GOLDBERG, and BURTON BERGER, of counsel,) for appellant.

LEE, GIEREN & PHELAN, and EUGENE A. TAPPY, both of Chicago, for appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

This is a direct appeal, based upon the loss of a freehold, prosecuted by appellant, Mathilde J. Turner, herein referred to as plaintiff, to review a decree of the superior court of Cook County, dismissing an amended and supplemental complaint by which she sought to set aside a trust agreement that had been executed by her late husband, to establish a constructive trust of the real estate involved therein, and to void an antenuptial agreement under which she had relinquished all right to her husband's property. She now contends that the lower court erred in failing to grant the

requested relief and in admitting certain evidence offered by the defendants.

The action was originally instituted on October 21, 1955, by the husband, Montague J. Turner, against Benjamin H. Black, his former attorney, to require the latter to reconvey to him certain real estate he had previously deeded to Black, as trustee. By his answer, Black alleged the existence of a valid trust agreement; that the trust was by its terms irrevocable; and that the beneficiaries thereof were Turner's wife, Mathilde, his daughter-in-law, Gladys C. Ware, his granddaughters, Cathryn T. Schopf and Phyllis T. Reyling, and his friend, Robert Madden. The aforesaid beneficiaries were subsequently joined as parties defendant in the case after which the matter was referred to a master in chancery, but before the hearings were concluded, Montague J. Turner died, and his wife, Mathilde J. Turner, both individually and as his executrix, was substituted as party plaintiff.

Montague J. Turner was born in 1873 and was married for many years to Catherine A. Turner prior to her death in April, 1954. Two children, Grace Seggebruch and Joseph Turner, were born of this marriage but the latter died some years prior to 1954 leaving his wife, now Gladys Ware, and his two children, Cathryn T. Schopf and Phyllis T. Reyling, surviving. Following the death of Catherine A. Turner, certain difficulties arose between Montague J. Turner and his daughter, and in October, 1954, she had him placed in a psychopathic hospital pending involuntary commitment. Prior to this time Turner had been represented by Stanley A. Wilczynski, a Chicago Heights attorney, but because of the latter's friendship with the daughter, Grace Seggebruch, Turner decided to seek other counsel to resist his commitment, and allegedly asked his friend, Robert Madden, to assist him in this regard. Madden contacted his brother, an attorney, and the latter recommended the defendant, Benjamin H. Black, who thereafter visited

Turner at the hospital where he was engaged by Turner as his attorney. At a hearing held on October 26, 1954, which Turner and Black attended, the former was adjudged free of psychosis and was dismissed from the hospital.

Upon being released, Turner proposed marriage to his housekeeper, the present plaintiff, who was some 33 years his junior, and on October 30, 1954, the two of them went to Black's office where an antenuptial agreement was executed which recited that Turner owned real estate worth approximately $225,000, that plaintiff waived and relinquished all dower, homestead, and marital rights therein with the exception of $10,000 which she was to receive upon Turner's death, and that plaintiff would execute and acknowledge upon the request of Montague J. Turner, or his heirs, devisees, personal representatives, executors, or assigns, all instruments necessary to free the property of such marital rights. The antenuptial agreement bore the signatures of plaintiff and Turner; each paragraph thereof was initialled by the plaintiff; but it was neither witnessed nor acknowledged. On the same occasion, Montague J. Turner executed a will whereby the sum of $10,000 was bequeathed to plaintiff in accordance with the antenuptial agreement; identical amounts of $25,000 were to be paid to Cathryn T. Schopf, Phyllis T. Reyling, and Robert Madden, respectively; $15,000 was to be given Gladys Ware and the residue of the estate was to go to the plaintiff.

Thereafter, plaintiff and Turner were married but did not live together until December, 1954, at which time they and the plaintiff's adult son by a former marriage moved into one of the apartments owned by Turner. On February 18, 1955, Turner again appeared at Black's office and this time executed a deed in trust to Benjamin H. Black for the real estate in question and, together with Black, also signed an irrevocable trust agreement under which Turner was to have all control of the property and receive all income therefrom during his lifetime, and upon his death,

the trustee was to sell the property and divide the proceeds in the same manner as provided in Turner's will of October 30, 1954. Some three weeks later, being March 9, 1955, a new will was prepared by Stanley A. Wilczynski, Turner's former attorney, and executed by Turner. It provided bequests of one dollar to Grace Seggebruch, Cathryn T. Schopf, and Phyllis T. Reyling, with the balance of the estate going to the plaintiff, who was also named executrix.

It appears that in July, 1955, Turner engaged John B. Heinemann, a Chicago attorney, to acquire a reconveyance of the property Turner had previously conveyed to Black, and on August 1, 1955, Turner and plaintiff executed an agreement which sought to cancel the prior antenuptial agreement as being unfair. On August 26, 1955, Turner's will of March 9, 1955, was republished in the presence of the attorney, Stanley A. Wilczynski, and having failed to receive a reconveyance from Black, the present case was instituted on October 21, 1955. About one year later, on October 24, 1956, Turner executed a formal revocation of his will dated October 30, 1954, and upon Turner's death on March 12, 1957, his will of March 9, 1955, was admitted to probate.

Upon hearing of this cause, Montague J. Turner testified that he had known Robert Madden, a coal dealer, for approximately 14 years during which time he had shown Madden how to run the coal business, assisted Madden in making repairs around the Madden property, and built a house for Madden, who in turn assisted Turner with his income tax returns. Turner denied that he had engaged Black while at the psychopathic hospital but insisted that Madden had merely brought Black to the hospital of his own accord. According to him, he and plaintiff were taken by Madden to Black's office on October 30, 1954, and were shown the antenuptial agreement and will which had already been prepared. Although Turner contended he did not have his glasses with him on that occasion and that

Black did not explain the provisions thereof, he admitted that the bequests to his grandchildren were as he desired and that the instruments were signed by him. A similar situation allegedly prevailed at the time the deed in trust and trust agreement were executed in February, 1955. On that occasion Madden was said to have called Turner and insisted that he go with him, without his wife, to Black's office where the instruments were waiting. Turner maintained he did not ask that these papers be prepared, that he did not read them before they were signed, and that their provisions were not explained or read to him. He admitted that in 1956 he had on occasions lived with relatives and at an old-folks' home.

Robert Madden testified that he lived across the street from Turner's home and had known Turner for about 15 years. During this time he had occasion to give Turner coal for his apartment houses, prepare his income tax returns, write letters for him at his request, procure credit information concerning certain tenants, and perform other favors for him without charge. Turner visited Madden regularly at home and at his place of business, but Madden denied that he had ever advised Turner on business matters or handled his financial affairs. When Turner was placed in the psychopathic hospital, Madden visited Turner and was then asked to find a lawyer to represent him. According to Madden, he called his brother, a practicing attorney, and was referred to the defendant Black, who prior to that time had never known or represented Madden or Turner. At the hospital Madden introduced Black to Turner, and he also brought Turner and his prospective bride to Black's office on October 30, 1954, at Turner's request. On that occasion Madden observed plaintiff sign the antenuptial agreement and heard Black explain both documents to Turner, although he was not present when the Turner will was actually executed. Similarly, he drove Turner to Black's office on February 18, 1955, when the trust agree-

ment was executed but he was not present when the business was conducted nor did he even know that he was to share in the estate until after the documents were signed. Madden denied that he had ever discussed with either Turner or Black the possibility of his being named as legatee or beneficiary, and further denied that he had ever asked Turner to so provide for him or had any arrangement whatsoever with Black in this regard. He also mentioned that in April, 1956, Turner ran away from home and lived first with a friend, then with his granddaughter, and finally at a nursing home in St. Anne. Finally, he stated that before testifying in this cause he had assigned to Cathryn T. Schopf and Phyllis T. Reyling, without consideration, all interest which he owned in the Turner property.

Testifying in his own behalf, Benjamin H. Black related that on October 22, 1954, he received a telephone call from Madden and was requested to visit Turner at the psychopathic hospital which he did two days later. On that occasion Turner allegedly told Black of his daughter's attempt to get him committed and asked Black to represent him in the matter. To evidence the employment, Turner at that time gave Black written authority to act upon his behalf in place of his former attorney, Stanley Wilczynski, and Black later telephoned the former counsel to advise him of this change. Upon his release from the hospital Turner discussed with Black his impending marriage and asked him to prepare a will and an antenuptial agreement. This was done, and on October 30, 1954, the documents were executed in the attorney's office. According to Black, he discussed the antenuptial agreement with Turner and plaintiff, and explained its provisions and effect, advised plaintiff of her right to independent counsel, and then had plaintiff initial each paragraph thereof after reading it carefully. A few months after the marriage, as related by this witness, Turner contacted Black and complained that his wife and son were trying to get him to

convey his property to them, were threatening to do him bodily harm if he refused, and were generally making his life miserable. As a result of this discussion Turner decided to place his property in an irrevocable trust in the hope that this would remedy the situation and to this end a deed in trust and trust agreement were prepared, which on February 18, 1955, were executed by Turner in the presence of Black and a witness, Rudolph Salmon. Black swore that before these documents were signed they were fully explained to Turner and he signified his approval. He also reiterated that he had never known Turner or Madden prior to October 22, 1954, had never collected rentals from the trust property, and had never been paid for any of the services rendered by him to Montague J. Turner.

Rudolph Salmon, who occupied office space in the same suite as defendant Black, acknowledged that he was present on February 18, 1955, and witnessed Turner execute the trust agreement. According to this witness, Black read the instrument over aloud before it was signed and then asked Turner if he understood it. Turner replied that he did whereupon Salmon informed him of the irrevocable nature of the agreement and Turner said this was what he wanted. Alice Follingstad, Black's secretary, testified that she was present on February 18, 1955, when Turner signed the deed in trust, and at that time acknowledged his signature.

The plaintiff, Mathilde Turner, said she first started to do housework for Turner after his first wife's death, and following Turner's release from the hospital in October, 1954, accepted his offer of marriage. She accompanied Turner to Black's office on October 30, 1954, where she was advised that in accordance with documents he had prepared she would upon Turner's death receive $10,000 plus all sums remaining after bequests of $25,000 were paid to each of the grandchildren and to Madden, and a bequest of $15,000 was paid to Gladys Ware. She swore

she did not read the antenuptial agreement but merely initialed and signed it as requested by Black after which she left the office while Turner executed his will. She further related that on February 17, 1955, Madden called and said he would take Turner to Black's office the following day to sign some papers but that she could not accompany them. As he promised, Madden took Turner to Chicago about noon the next day and returned him to his home some six hours later. To the best of her recollection, Black at no time gave copies of the various instruments either to her or her husband. She admitted that in 1956 Turner left home for some six weeks during which time she did not know his whereabouts. Although the antenuptial agreement indicated that the value of Turner's real estate was approximately $225,000, evidence was offered to show that its actual value was only $70,000.

A constructive trust may be established by proof of a fiduciary relationship plus a subsequent abuse by the dominant party of the confidence reposed in him for the purpose of acquiring a personal benefit. (*Stephenson* v. *Kulichek,* 410 Ill. 139.) A fiduciary relationship exists as a matter of law between attorney and client and may occur in every case where confidence and trust is reposed on one side and domination and influence on the other. (*Bremer* v. *Bremer,* 411 Ill. 454.) Where an attorney engaged in a transaction with his client and is benefited thereby, the burden rests with the attorney to show the fairness of the affair, that it was equitable and just, and that it did not proceed from undue influence. (*Vrooman* v. *Hawbaker,* 387 Ill. 428; *Fisher* v. *Burgiel,* 382 Ill. 42.) Where a fiduciary relationship does not exist as a matter of law, the relationship must be proved by clear and conclusive evidence when claimed as a basis for the establishment of a constructive trust, (*Galvin* v. *O'Neill,* 393 Ill. 475,) and the mere existence of a fiduciary relationship does not, of itself, give rise to a constructive trust but there must in

fact exist an abuse of that relationship. *Jones* v. *Washington*, 412 Ill. 436.

In the present case a fiduciary relationship of course existed between Benjamin Black, the attorney, and Montague J. Turner, the client, but in our opinion the record does not establish an abuse of that relationship. Black had never known Turner or the plaintiff until he was called to the hospital on October 24, 1954, and some six days later an antenuptial agreement was executed by the parties and a will was drawn in accordance therewith. The brevity of this acquaintance itself tends to negative the thought of undue influence. The provisions of the trust agreement, even though executed by Turner some four months after the will, contained the same instructions concerning the disposition of his property and indicates a continuing intention. Although Turner and plaintiff both contend that the documents were not read or explained to them, there is little doubt but what they knew the nature of the instruments and the general provisions thereof. Turner himself testified that the bequests to his grandchildren were as he desired, and witnesses not a party to the suit swore that the deed in trust and trust agreement were fully explained to Turner before they were voluntarily executed by him. There is nothing whatsoever to indicate any collusion between Black and Madden or that Black even knew Madden prior to October, 1954. Furthermore, it must be noted that Black was not a beneficiary of the trust, received no benefit therefrom, and in fact has not as yet been paid the fees which he claims are now due for the preparation of such instrument. Under these circumstances, it can hardly be said that he took advantage of a situation for personal gain.

As to Madden, it was incumbent upon the plaintiff to show the existence of a fiduciary relation, and in our opinion, she failed in this regard. There is no doubt but what Turner and Madden were good friends and neighbors for a number of years and exchanged favors with each other,

but this, in itself, does not indicate a legal relationship. (*Pfaff* v. *Petrie*, 396 Ill. 44.) There was no evidence of business dealings between them, no showing that Turner either sought or received Madden's advice upon business matters, and in fact no indication that Madden had acquired any influence over Turner whatsoever. Although Madden performed small services for Turner without charge, these acts of kindness were fully reciprocated by the latter, and together they give no indication of a dominant and servient situation. Neither was there any showing that Madden sought to influence Turner for his personal benefit, was responsible in any manner for the establishment of the trust agreement, connived with Black or the other defendants, or in any way acted contrary to Turner's interests. The lower court did not err in failing to set aside the trust agreement and in refusing to establish a constructive trust.

Plaintiff also contends that the antenuptial agreement is void for the reasons that it was never acknowledged and was later revoked in writing by the parties and by Turner's subsequent will. There is no doubt but what parties to an antenuptial agreement may, after marriage, by mutual consent alter or revoke the agreement except as against children or others taking as purchasers thereunder, and, to determine whether or not such third-party interests exist, the entire agreement together with attendant circumstances must be considered. (*Seuss* v. *Schukat*, 358 Ill. 27; 26 Am. Jur., Husband and Wife, sec. 292 and sec. 302.) Here, the antenuptial agreement particularly recites that its purpose was to give Turner an unrestricted right to make disposition of his property by will "so that said property or the cash value thereof, shall vest in his legatees and devisees," and it goes on to provide that plaintiff will upon request of Turner, or "his heirs, devisees, personal representatives, executors, or assigns" execute deeds and other instruments necessary to free such property from her apparent marital

rights so that it might be freely disposed of by "Montague J. Turner or his heirs, devisees, personal representatives or executors, administrators, or assigns." Since the parties at the time of marriage were of such an age that children of that union could hardly have been expected, it is clear that the agreement was designed to benefit Turner's heirs, as they then existed, and all others to whom he desired to devise his property. Although he might well have retained title until he died, and thereby been in a position to change the objects of his bounty from time to time by will, for personal reasons he desired during his lifetime to create an irrevocable trust which had the effect of forever fixing the ultimate recipients of his property. As a result, the trust beneficiaries acquired the position of purchasers under the antenuptial agreement and were protected from the later attempt to revoke that antenuptial agreement and thereby indirectly change the trust agreement which was by its terms irrevocable. (*Morris* v. *Masters,* 349 Ill. 455; *Dunlop* v. *Lamb,* 182 Ill. 319.) Therefore, the subsequent instruments purporting to alter the antenuptial agreement were ineffective as to the property included in the trust agreement, and plaintiff's dower and marital rights therein, except homestead, were fully barred.

As to homestead, a different situation prevails. Section 4 of our Homestead Act (Ill. Rev. Stat. 1953, chap. 52, par. 4,) provides that, except by means not here material, no release or waiver of homestead shall be valid unless the same is in writing, subscribed by the householder and his spouse, and acknowledged in the same manner as conveyances of real estate are required to be acknowledged, and we have heretofore held that an antenuptial agreement must be acknowledged in order to bar the homestead estate. (*Zachmann* v. *Zachmann,* 201 Ill. 380; *Crum* v. *Sawyer,* 132 Ill. 443; *Achilles* v. *Achilles,* 137 Ill. 589; *McMahill* v. *McMahill,* 105 Ill. 596.) Since in the present case the antenuptial agreement was not acknowledged, it did not

in and of itself bar plaintiff's right to homestead. It should be pointed out, however, that we are not deciding whether, by the terms of that antenuptial agreement, plaintiff is bound without further consideration to convey her existing homestead interest in the trust property should she be requested to do so by a beneficiary thereof.

Finally, plaintiff contends that the lower court erred in allowing Black to testify concerning conversations he had with the decedent and client, Montague J. Turner, shortly before October 30, 1954, on October 27, 1954, November 20, 1954, and on February 15, 1955. It appears that the objection directed to the October 27 conversation was sustained by the master in chancery, and that the conversation of November 20 and the telephone communication of February 15 were relative to Turner's difficulties with his daughter and reference thereto had no prejudicial effect upon the issues at hand. As to the other conversations, Black testified that shortly before October 30, 1954, the date the will and antenuptial agreement were signed, Turner telephoned him and was advised that the papers were ready and that he and plaintiff should come to Black's office on October 30, to execute them. Black also related that on February 15, 1955, at his office, Turner told him that plaintiff and her son were making him miserable and then instructed Black to prepare the irrevocable trust agreement. As will be noted, this was entirely contradictory of Turner's earlier testimony that he had not instructed Black to prepare the various instruments. The privilege which exists between attorney and client, like most privileges, may be waived by the person whom the privilege is intended to benefit. By voluntarily testifying as he did, Turner waived the attorney-client privilege and opened the way for Black to testify concerning such matters. (*People* v. *Gerold,* 265 Ill. 448.) Although Turner was deceased and his wife, both individually and as executrix, had been substituted as party plaintiff prior to the date Black appeared as a

witness, the latter's testimony was properly received as an exception to the so-called Dead Man's Statute by reason of Turner's earlier testimony. (Ill. Rev. Stat. 1953, chap. 51, par. 2.) The lower court committed no error in this regard.

For the reasons stated it is our opinion that the decree of the superior court of Cook County should be affirmed in all respects except insofar as it holds that plaintiff has waived her homestead interest. In this sole respect the lower court decision must be reversed.

*Affirmed in part and reversed in part.*