ROBERT RAY, Plaintiff-Appellee, *v.* EMERSON J. WINTER *et al.*, Defendants-Appellants.

Fifth District   No. 74-129

Opinion filed June 10, 1976.

568

JONES, J., dissenting.

Russell H. Classen, of Belleville, for appellants.

Paul M. Caldwell and Robert S. Hill, both of Benton, for appellee.

Mr. PRESIDING JUSTICE KARNS delivered the opinion of the court:
Plaintiff, Robert Ray, brought an action for the declaration of a constructive trust in his favor upon approximately 40 acres of land which had been purchased by defendants, Emerson J. and Joyce E. Winter, and for damages for lost profits arising from plaintiff's inability to enter the land to raise crops. The trial court entered a decree whereby the court declared that defendants held the 40 acres in constructive trust for

plaintiff, ordered defendants to convey the land to plaintiff upon plaintiff's payment of $5,333.20 and awarded plaintiff $2,500 damages. Defendants filed a post-trial motion, which was denied. Defendants appeal.

The facts in this case can be briefly summarized as follows. Plaintiff wished to purchase some land and had made inquiry concerning a tract of approximately 60 acres near his home in Thompsonville, Illinois. He learned that the land was owned by a man named Mullikin who lived in Kankakee, Illinois. In July of 1972 plaintiff contacted Mullikin to discuss the matter and Mullikin agreed to sell the 60 acres to plaintiff for $8,000, apparently an attractive price. Because plaintiff did not then have the amount of money needed, he asked Mullikin to save the land for him until he sold some cattle in the fall of the year. Mullikin agreed to do so.

A short time thereafter, plaintiff became aware that Emerson Winter was also looking for some land to purchase in the same area of Illinois. When Emerson and Joyce Winter came to plaintiff's home in mid-July of 1972, plaintiff told Emerson Winter of his arrangement with Mullikin, took Winter to see the land and told Winter that he would sell 20 of the 60 acres to him at the same price per acre which plaintiff was to pay Mullikin. On August 15, 1972, plaintiff and defendants had a telephone conversation in which they discussed the possibility that Mullikin might sell the land to some other party. The source of their concern is not indicated in the record, and there was conflicting evidence at the trial regarding whether it was plaintiff or defendants who originally called to the attention of the other the matter of the possible sale by Mullikin to some other party. At any rate, during the conversation of August 15, 1972, the parties decided that Emerson Winter, who either had the necessary $8000 for the purchase of the 60 acres or could easily get the money, should himself contact Mullikin and make the purchase of the 60 acres.

Plaintiff gave defendants Mullikin's telephone number, and Emerson Winter immediately thereafter contacted Mullikin and arranged for the sale of the land by Mullikin to the Winters. At this point the evidence is in conflict. Plaintiff testified that the decision to allow defendants to purchase the entire tract was predicated upon an agreement that defendants would convey 40 acres to plaintiff when plaintiff sold his cattle and the money was available. Defendant Emerson Winter denied any knowledge of this agreement and stated that he bought the entire acreage when plaintiff informed him that he did not intend to place a mortgage upon his own property and would therefore not have adequate funds to purchase the land. Defendant denied any knowledge of plaintiff's intention to sell the cattle to obtain enough money to make a down payment on the property.

Plaintiff gave defendants Mullikin's telephone number, and Emerson

Winter immediately thereafter contacted Mullikin and arranged for the sale of the land to the defendants. Plaintiff also contacted Mullikin to accede to the sale. It is not clear whether plaintiff informed Mullikin of the alleged agreement with the defendants and Mullikin did not testify at trial.

Because of difficulties with abstracting and recording, the sale was not consummated until late October, 1972, and the final payment was not made until late November. Prior to that time plaintiff contacted defendants once to inquire whether plaintiff could remove hay from the property and prepare the ground for planting. Defendant Emerson Winter informed plaintiff that he had not yet completed the purchase of the tract and could therefore not give such permission. Nothing was said at this time about the alleged agreement.

The next contact between the parties came in January, 1973, when defendant Joyce Winter wrote to Mrs. Ray that defendants intended to keep the entire 60 acres. Plaintiff responded with an apparently bitter and obliquely threatening letter to defendant Emerson Winter. Defendant responded with a letter to plaintiff that the situation could have been "worked out" but for plaintiff's letter. It was apparently this bitterness which prompted defendants' final decision to keep the entire tract even though defendant Emerson Winter admitted at trial that he did not want the 40 acres.

It is undisputed from the evidence that defendants paid the entire consideration for the property including the costs of the sale, abstracting and recording. Plaintiff at no time tendered any money to defendants even though plaintiff sold the cattle in September, 1972. The only contact between the parties between August, 1972, and January, 1973, was the conversation about the hay during which no mention of the alleged agreement was made. Defendants, after having purchased the land, decided to keep the entire 60 acres and refused to convey the 40 acres which plaintiff had wished to obtain to plaintiff. As a result, plaintiff brought the instant action.

Various motions were filed by both sides in this case. Two of these motions, plaintiff's motion to dismiss the appeal and defendants' motion to add certification to the report of trial proceedings, were ordered taken with the case and must be discussed before reaching the merits of the case. It is our opinion that the motion to dismiss should be denied and that we should treat the report of proceedings as if it were properly certified.

Defendants filed their notice of appeal in the trial court on March 4, 1974. On May 6, 1974, defendants filed in the appellate court a motion for an extension of time to file the record on appeal and the report of proceedings. They were allowed until June 24, 1974, to do so. On June 27, 1974, three days after the expiration of the extended time, defendants

filed the report of proceedings in the trial court and on July 1, 1974, seven days after the expiration of the extended time, they filed the record. Plaintiff made no objection to the tardiness of the filing of the record and the report of proceedings. Defendants filed a motion to extend the time for filing the brief and abstract or excerpts from the record on August 2, 1974, and they were allowed until August 19, 1974, to do so. The abstract and the appellants' brief were both timely filed on August 8, 1974, and August 19, 1974, respectively.

On September 13, 1974, plaintiff filed a motion to dismiss the appeal, asserting several grounds for such dismissal, among which were the following: (1) the appeal bond had not been properly filed; (2) the report of proceedings had not been presented to the trial judge for certification, and a stipulation for waiving certification had not been made; (3) the praecipe for record had not been filed; (4) the original record on appeal had not been filed in the appellate court; (5) the abstract failed to include the notice of appeal, the judgment or order appealed from, the pleadings, the conference on instructions and the instructions appealed from, and the exhibits; and (6) the appellants' brief failed to comply with Supreme Court Rule 342 in a number of specified respects.

On September 27, 1974, defendants filed an answer requesting a denial of plaintiff's motion to dismiss and requesting that defendants be allowed to file a supplemental abstract. After plaintiff filed an objection to defendants' answer, this court allowed defendants to file a supplemental abstract and ordered plaintiff's motion to dismiss to be taken with the case.

On December 19, 1974, defendants filed in this court a motion to add certification to the report of proceedings. Attached to the motion was a prepared order of certification which defendants sought to have submitted to the trial judge for his signature. This motion was also ordered to be taken with the case.

As of the time of oral argument, according to plaintiff's counsel, all of the deficiencies pointed out by plaintiff's motion to dismiss had been corrected except for the lack of certification of the report of proceedings. We are thus faced with the sole question whether the appeal should be dismissed for failure of defendants to have the report of proceedings certified by the trial judge.

Supreme Court Rule 323(b), (d) (Ill. Rev. Stat. 1975, ch. 110A, pars. 323(b), (d)), provides in pertinent part:

> "(b) Certification and Filing. A report of proceedings shall be submitted, upon notice, to the judge before whom the proceedings occurred or his successor (or if that is impossible because of his absence or his sickness or other disability, then to any other judge of the court) for his certificate of correctness, and shall be filed,

duly certified, in the trial court within 49 days after the filing of the notice of appeal. If, however, the parties so stipulate, a report of proceedings may be filed without certification.

\* \* \*

(d) Agreed Statement of Facts. The parties by written stipulation may agree upon a statement of facts material to the controversy and file it without certification in lieu of and within the time for filing a report of proceedings."

It is undisputed that the parties did not stipulate that the report of proceedings could be filed without certification or that an agreed statement of facts could be filed in lieu of the report of proceedings. Thus it was incumbent upon the defendants to obtain the trial judge's certification of the report of proceedings according to Supreme Court Rule 323(b).

Thus, the important question concerns the effect of defendants' failure to obtain such certification. Several Illinois cases have given consideration to this problem under present Supreme Court Rule 323(b) or its predecessors. In *Morse v. Williams*, 5 Ill. (4 Scam.) 285 (1843), the court sustained the motion to strike the cause from the docket because the transcript had not been certified by the trial court. In *Lindgren v. Swartz*, 49 Ill. App. 488 (2d Dist. 1893), and *Hall's Safe Co. v. Emmerson*, 169 Ill. App. 156 (4th Dist. 1912), the courts held that the certificate of the court reporter could not substitute for the certificate of the judge and that, since the judge's certificate was lacking, the alleged errors could not be considered and the judgments were affirmed. Similar rulings were made by the courts in *Hayes v. U.S. Materials Co.*, 228 Ill. App. 286 (1st Dist. 1923), and *First National Bank v. 10 West Elm Street Building Corp.*, 277 Ill. App. 337 (1st Dist. 1934).

Considering the necessity of the certification of the report of proceedings, the court in *Suttles v. Zimmerman*, 287 Ill. App. 316, 318, 5 N.E.2d 94, 95 (4th Dist. 1936), stated:

"We think the authorities cited establish the rule that the transcript of proceedings, now provided for by the Civil Practice Act, must be authenticated as to completeness and correctness, by the signature of the judge presiding at the trial, and that unless same is done it is the duty of the reviewing court to dismiss the appeal when its attention is drawn to such fact."

In *Second National Bank v. Jones*, 309 Ill. App. 358, 33 N.E.2d 732 (4th Dist. 1941), the court held that no precise or technical form of certification was required; the court also, however, reiterated its position taken in *Suttles* that certification was necessary. The court stated:

"[I]t is the conclusion of this court that no precise or technical form of certification is required, and that the test should always be

whether the transcript has, in fact, been certified by the court, irrespective of the form of such certificate. We do not desire, however, that this opinion carry with it the implication that appellant is relieved of the necessity of obtaining a certificate by the trial judge of such correctness and completeness." 309 Ill. App. 358, 362, 33 N.E.2d 732, 735.

The court in *Arndt v. Arndt*, 336 Ill. App. 65, 82 N.E.2d 908 (1st Dist. 1948), not confronted with a situation in which it had to determine the effect of a lack of certification of the report of proceedings, nevertheless pointed out:

"Rulings of a court at a trial are properly shown by a report of proceedings in the form of a complete stenographer's report or a condensed statement, or, in lieu thereof, a written stipulation of the facts material to the controversy, either of which must be certified by the trial court to be correct." 336 Ill. App. 65, 70, 82 N.E.2d 908, 910.

In *Walker v. Walker*, 6 Ill. App. 3d 214, 285 N.E.2d 235 (1st Dist. 1971) (abstract opinion), the court dismissed the appeal because the report of proceedings was both incomplete and uncertified by the trial judge.

In their answer to the motion to dismiss the appeal the instant defendants have argued that this court under Supreme Court Rule 329 (Ill. Rev. Stat. 1975, ch. 110A, par. 329), can either supply the required certification itself or allow defendants to return to the trial court and obtain such certification. Rule 329 provides:

"The record on appeal shall be taken as true and correct unless shown to be otherwise and corrected in a manner permitted by this rule. Material omissions or inaccuracies or improper authentication may be corrected by stipulation of the parties or by the trial court, either before or after the record is transmitted to the reviewing court, or by the reviewing court. Any controversy as to whether the court accurately discloses what occurred in the trial court shall be submitted to and settled by that court and the record made to conform to the truth. If the record is insufficient to present fully and fairly the questions involved, the requisite portions may be supplied at the cost of the appellant. If necessary, a supplemental record may be certified and transmitted."

Defendants also direct our attention to the Committee Comments to this Rule (Ill. Ann. Stat., ch. 110A, par. 329 (Smith-Hurd 1968)), which state:

"This rule is a comprehensive provision covering amendment of the record on appeal, correction of improper authentication, and the settling of any questions concerning whether the record conforms to the truth. It contains portions of former rule 36(3) and (4). Under this sweeping provision, it will be possible to supply

omissions, correct inaccuracies or improper authentication, or settle any controversy as to whether the record on appeal accurately discloses what occurred at the trial by the procedure that will most appropriately solve the particular problem. In view of the liberal terms of this paragraph, the rather elaborate provisions of former rule 36(4), requiring that a claim as to improper authentication be raised by motion before or at the time of the filing of the brief of the party making the claim, were eliminated as no longer necessary. Unless there is some real prejudice involved, there will be no incentive for claiming improper authentication."

■■ It is clear that had defendants made some attempt to obtain certification of the report of proceedings but fell short of being in complete conformity with the requirements of Supreme Court Rule 323, this court would have had the power to treat the report of proceedings as if it were properly authenticated. (*Yoselle v. Yoselle*, 54 Ill. App. 2d 354, 204 N.E.2d 129 (1st Dist. 1964); *Second National Bank v. Jones*; Supreme Court Rule 329.) It is also true that this court could treat the report of proceedings as properly authenticated if defendants had sought the certification of the trial judge but such certification was withheld despite the lack of objection to the accuracy of the report of proceedings. (*Jaskowiak v. Village of Posen*, 70 Ill. App. 2d 409, 218 N.E.2d 6 (1st Dist. 1966); *Torrance v. City National Bank*, 32 Ill. App. 2d 288, 177 N.E.2d 646 (2d Dist. 1961) (abstract opinion).) Our concern here, however, is in determining what effect defendants' failure not only to obtain certification, but also to seek certification, should have.

Most significant in this regard is the fact that plaintiff has made no claim in his motion to dismiss, in his brief, during oral argument, or at any other time, that the report of proceedings before this court is either incomplete or inaccurate. Under former Supreme Court Rule 36(4) (Ill. Rev. Stat. 1961, ch. 110, par. 101.36), plaintiff would have been required to support his motion to dismiss by affidavit showing both that the uncertified report of proceedings was inaccurate and that prejudice would result to him as a consequence of the inaccuracy. Present Supreme Court Rule 329, which is a combination of portions of former Rule 36(3) and (4), has omitted the requirement of the affidavit claiming inaccuracy and prejudice. This does not mean, however, that under present Rule 329 a party can simply show that certification is lacking and obtain a dismissal. As pointed out by the first sentence of Rule 329, the record on appeal which, of course, may include the report of proceedings, is presumed "true and correct unless shown to be otherwise * * *."

The second sentence of Rule 329 provides that "[m]aterial omissions or inaccuracies or improper authentication" may be rectified by the trial

court, by the reviewing court, or by the stipulation of the parties. Although one could argue otherwise, the best interpretation of this sentence, in our opinion, is that the term "material omissions" includes lack of certification. This interpretation is in harmony with the overall purpose of Rule 329, which, as pointed out by the Committee Comments to the Rule, is intended to provide the court with much latitude in dealing with any controversy over the accuracy of the record on appeal. Therefore, since plaintiff has not indicated that the report of proceedings in the instant case is either incomplete or inaccurate or that he is prejudiced by the lack of certification by the trial judge, and since the report is presumed true and accurate unless otherwise shown, we will treat the report as if properly certified and proceed to discuss the merits of the appeal.

We recognize that this is a departure from the rule established in *Morse v. Williams, Suttles v. Zimmerman,* and other cases discussed above. It is, however, a result consistent with the liberalized provision of Rule 329 and a result consistent with the underlying reason for the certification requirement, that is, simply to assure the accuracy and completeness of the report of proceedings. We also recognize that had the record been incomplete as well as uncertified, a different result would be required here. (See *Walker v. Walker.*) Similarly, we should point out that were we dealing in the instant case with a bystander's report in lieu of a verbatim transcript, certification by the trial judge would be of much greater importance; and without such certification or stipulation by the parties, dismissal of the appeal or affirmance of the judgment would be required. (See *Belcher v. Spillman,* 28 Ill. App. 3d 973, 329 N.E.2d 550 (1st Dist. 1975).) Finally, although we have decided to review the instant case on its merits we reiterate our position in this regard as stated in *Wenige-Epperson, Inc. v. Jet Lite Products, Inc.,* 28 Ill. App. 3d 320, 321, 328 N.E.2d 665, 666 (5th Dist. 1975):

> "[W]e have decided to review the case on its merits, and the motion [to dismiss] is therefore denied. We note, however, that significant, unexcused failure of compliance on the part of defendant-appellant with the Supreme Court Rules appears of record. We strongly disapprove of any noncompliance with the rules of procedure adopted to expedite the appellate process and will not hesitate to dismiss an appeal where appropriate."

■■ Plaintiff also contends that defendants are bound by the special interrogatories returned by the jury since no direct challenge was made to them in the post-trial motion and notice of appeal. We disagree. In an action in equity neither side is entitled to a trial by jury although the court in its discretion may impanel a jury to act in an advisory capacity on matters of fact. (Ill. Rev. Stat. 1975, ch. 110, par. 63.) The verdict is in no

way binding upon the trial court (*Sidwell v. Sidwell*, 28 Ill. App. 3d 580, 328 N.E.2d 595 (4th Dist. 1975)) and is not binding upon us on review, and, therefore, no motion directed against the finding or appeal therefrom is required.

Defendants have raised two issues for review: (1) whether a constructive trust can be imposed where the Statute of Frauds was pleaded by defendants as an affirmative defense to which plaintiff did not file a reply; and (2) whether awarding $2500 for loss of profits resulting from plaintiff's inability to use the land was appropriate. Our disposition of the case makes it unnecessary for us to consider the second issue.

Defendants' first contention, which concerns the applicability of the Statute of Frauds, is based upon a misunderstanding of the nature of a constructive trust and the provisions of the Statute of Frauds. First of all, we should point out that if the plaintiff in the instant case had sought to recover on the basis of an express, oral trust between plaintiff and defendants, the Statute of Frauds would have been a good defense to plaintiff's cause of action. (Ill. Rev. Stat. 1975, ch. 59, par. 9.) However, plaintiff sought to recover not on the basis of an express trust, but rather on the theory that the court, acting as a court of equity, should impose a constructive trust.

■■ A constructive trust is not dependent upon an express agreement of the parties and is specifically exempted from the writing requirement of the Statute of Frauds. (Ill. Rev. Stat. 1975, ch. 59, par. 9; *Crossman v. Keister*, 223 Ill. 69, 79 N.E.58 (1906) *Giese v. Terry*, 382 Ill. 34, 46 N.E.2d 90 (1943); 2 Restatement (Second) of Trusts §406, at 327-28 (1959); 76 Am. Jur. 2d *Trusts* §194, at 427-428 (1975).) Thus, the Statute of Frauds is not a valid legal defense to a request for the imposition of a constructive trust.

■■ A constructive trust is a restitutionary remedy to restore to a plaintiff property of which he has been unjustly deprived and to take from the defendant property which, if retained, would unjustly enrich him. (Restatement of Restitution §160, comment d (1937).) To raise a constructive trust there must be proof of fraud or that advantage was taken of a "fiduciary" or "confidential" relationship. (*Perry v. Wyeth*, 25 Ill. 2d 250, 184 N.E.2d 861 (1962).) To establish fraud there must exist allegations and proof that a party knowingly or intentionally made an untrue statement of fact for the purpose of inducing the other party to act and the other party rightfully believed and acted upon that statement to his detriment. (*Broberg v. Mann*, 66 Ill. App. 2d 134, 213 N.E.2d 89 (2d Dist. 1965); *Yates v. Cummings*, 4 Ill. App. 3d 899, 282 N.E.2d 261 (5th Dist. 1972).) A "confidential" relationship is merely another term to describe a "fiduciary" relationship. (*Kochorimbus v. Maggos*, 323 Ill. 510, 518, 154 N.E. 235 (1926).) Our examination of the cases reveal the terms to

be used interchangeably. Perhaps it might be more accurate to say that the existence of a confidential relationship may impose upon the dominant party fiduciary obligations in his dealings with the servient party. "A confidential relationship exists in all cases where one reposes trust and confidence in another who thereby gains a resulting influence and superiority over the other." (*Stone v. Stone*, 407 Ill. 66, 77, 94 N.E.2d 855, 861 (1950).) The relationship may exist as a matter of law between individuals in certain relationships, for instance, trustee-beneficiary, guardian-ward, attorney-client, principal-agent. Chapter 12 of the Restatement of Restitution concerns acquisition of property by a fiduciary and states the general rule that a fiduciary who acquires property in violation of his duty as fiduciary holds the property upon a constructive trust. Thus, if one agrees to act as agent to purchase property "on behalf of the other" (Restatement of Restitution §194(2) (1937)), a constructive trust results where that person purchases the property individually. "On the other hand, neither a constructive trust nor a resulting trust arises where one person agrees to purchase property and to resell it to another, where there is no fiduciary relation between the parties and the purchaser pays the purchase price with his own money and not by way of loan to the other, and the other had no pre-existing interest in the property." Restatement of Restitution §194, Comment on Subsection (2) (1937).

■■ The relationship may be "moral, social, domestic, or even personal." (*Stone v. Stone.*) However, where the relationship does not exist as a matter of law, the evidence must be clear and convincing so that it unequivocally and unmistakably leads to the conclusion that a fiduciary or confidential relationship exists. (*Regnier v. Lay*, 21 Ill. 2d 177, 171 N.E.2d 629 (1961); *Bennett v. Hodge*, 374 Ill. 326, 29 N.E.2d 524 (1940).) Among the factors to be considered in determining whether a fiduciary relationship exists are: degree of kinship between the parties, if any; disparity in age, health, mental condition, education and business experience between the parties; and the extent to which the allegedly servient party entrusted the handling of his business and financial affairs to the other and reposed faith and confidence in him. (*Kester v. Crilly*, 405 Ill. 425, 91 N.E.2d 419 (1950); *Cunningham v. Cunningham*, 20 Ill. 2d 500, 170 N.E.2d 547 (1960).) Furthermore, the existence of such a relationship does not of itself give rise to a constructive trust. The facts and circumstances must disclose either fraud or an abuse of that relationship. *Tarpoff v. Kanandjeff*, 51 Ill. App. 2d 454, 201 N.E.2d 549 (5th Dist. 1964); *In re Estate of Ray*, 7 Ill. App. 3d 433, 287 N.E.2d 144 (5th Dist. 1972).

Applying these principles to the instant case, we believe that the judgment entered below was not based upon sufficient proof. While the

relationship of principal and agent is clearly a fiduciary one, the evidence, considered most favorably to plaintiff, cannot be said to constitute defendants agents for plaintiff in the purchase of the land in question. No evidence demonstrated that either Emerson or Joyce Winter intended to defraud the plaintiff or at the time of the alleged oral agreement misrepresented their intention, and the plaintiff has not so suggested. Thus, no fraud was established to raise a constructive trust. The evidence also fails to indicate clearly and convincingly that a confidential relationship existed between Emerson Winter and Robert Ray. Ray testified that he had met defendant on four or five occasions and that he was a "friend." Winter testified that he had met Ray twice and did not think of them as "good" friends. The first contact of a business or financial nature between the plaintiff and the defendants was on July 28, 1971, the day that plaintiff allegedly took defendants into his trust and confidence. Since proof that parties were good friends, and neighbors for several years and that they exchanged favors is insufficient to establish a fiduciary relationship (*Regnier v. Lay; Turner v. Black*, 19 Ill. 2d 296, 306, 307, 166 N.E.2d 588, 594 (1960); *Pfaff v. Petrie*, 396 Ill. 44, 51, 71 N.E.2d 345, 349 (1947)), it is clear that the slight social contact shown here does not raise these parties to the level of fiduciaries.

■■ Plaintiff urges that because he gave defendant information regarding the purchase of certain real property that defendants occupied a relationship of trust or confidence to him. We disagree as this information was imparted to defendants in order to induce them to aid plaintiff in the purchase of the realty. The record reflects that plaintiff identified the property and the person from whom the owner's name and address could be obtained before any oral agreement was made to purchase the property jointly. Nor did plaintiff exact any promise from Emerson Winter that he only purchase the property jointly with him in exchange for the disclosure of this information. In short, it is difficult to understand just what "confidence" enabled the defendants to take advantage of the plaintiff since the latter was in no position to purchase the property and the owner was under no legal obligation to sell only to the plaintiff. Furthermore, the mere importing of a confidence does not create in law a fiduciary relationship in the absence of a clear showing that, by virtue of the confidence reposed, one party gains a superiority and influence over the other. Ray's inability to finance the immediate purchase of the 60 acres may indeed have resulted in the loss of an advantageous purchase of valuable farmland. Ray may have committed a serious error of judgment in revealing Mullikin's name to Winter and taking Winter upon the land. But no relationship existed between these parties at the time of this disclosure which can be denominated "fiduciary" or "confidential," nor does the disclosure of this information in confidence establish such a relationship. At most the evidence indicates an

oral contract between the parties, which fact alone does not make these persons fiduciaries to each other. (*Englestein v. Mintz*, 345 Ill. 48, 177 N.E. 746 (1931).) This purported oral contract involving an interest in land was never reduced to writing and hence is unenforceable under the Statute of Frauds. For this court to force the facts of this case into the mold of a confidential or fiduciary relationship in order to allow the plaintiff to obviate the defense of the Statute of Frauds would sanction the enforcement of oral contracts to convey land between parties under no disability, who in actuality are casual acquaintances, with equal business experience, dealing at arms length, in obvious defiance of the requirements of the statute. This we cannot do. Therefore, since plaintiff failed to demonstrate adequately either fraud or a fiduciary relationship and an abuse of that relationship, the trial court erred in imposing a constructive trust on the disputed farmland and in awarding plaintiff damages for defendants' retention of the land.

For the foregoing reasons, the judgment of the Circuit Court of Franklin County is reversed.

Reversed.

G. J. MORAN, J., concurs.

Mr. JUSTICE JONES, dissenting:

The majority has misinterpreted the facts of this case and applied the wrong principles of law to the facts, and, as an understandable consequence, has reached the wrong result. I therefore respectfully dissent.

Even though the defendants agreed voluntarily and gratuitously to act for the plaintiff in purchasing the land in question, and advanced the purchase price therefor, they are nevertheless held in equity to have acted for the plaintiff, and they will be deemed to hold the property in a constructive trust for the benefit of the plaintiff. Morals and good conscience require this result and all authorities are agreed that that result must pertain. I will refer to the Restatement Restitution; Scott on Trusts; Bogert, Trusts and Trustees; and cases of the Illinois Supreme Court and Appellate Courts.

The Restatement of Restitution §194(2) (1937) provides:

> "A person who agrees with another to purchase property on behalf of the other and purchases the property for himself individually holds it upon a constructive trust for the other, even though he is not under a duty to purchase the property for the other."

Since the Restatement Comment on subsection (2) is so pertinent and apt, I will quote from it at length.

"The rule stated in Subsection (2) is applicable where a person undertakes as fiduciary to purchase property and purchases it for himself, even though he would be under no liability for failing to acquire it for the beneficiary if he did not acquire it for himself. *This is true whether or not there is a preexisting fiduciary relation between the parties.* Thus, it is applicable where one person gratuitously and orally undertakes to purchase land on behalf of another. In such a case he is under no liability if he fails to acquire the property, since there is no consideration for his undertaking and no other circumstances imposing upon him a duty to acquire the property. If, however, in violation of his undertaking as fiduciary he acquires the property for himself, he holds it upon a constructive trust for the person for whom he undertook to acquire it.

Where one person orally undertakes to purchase land on behalf of another, it may be urged that the other cannot enforce a constructive trust because the undertaking is oral and there is no compliance with the provisions of the Statute of Frauds. The answer to this objection is that the other is not enforcing an oral contract, but is enforcing a constructive trust based upon the violation of fiduciary duty. *The undertaking to act for the other is sufficient to constitute the relation of principal and agent between them.* The relation arises although no consideration is paid or agreed to be paid by the principal to the agent; and the relation may arise although its creation is not evidenced by a written instrument, even though the agent is to purchase land for his principal. It is sufficient to create the relation that the one authorizes the other to act for him in making the purchase and the other undertakes to do so. If the agent purchases for himself the property which he has undertaken to purchase for his principal, he holds the property so purchased upon a constructive trust for his principal.

The rule is applicable not only where a person is employed professionally to purchase the property for the employer, as in the case of a real estate broker, but also where a person gratuitously agrees to purchase the property on behalf of another.

The rule stated in this Section is applicable where one person agrees to purchase property on behalf of another, whether he undertakes to purchase it in the name of the other, or in his own name, or in their joint names." (Emphasis added.) (Restatement of Restitution 797-799 (1937).)

Scott on Trusts §499 (3d ed. 1967) discusses the rule and its applicability to various factual situations. At page 3543 the author states:

"Even though there was no pre-existing fiduciary relation, and even though the defendant was not employed professionally by the complainant, and even though no continuing fiduciary relation was contemplated, yet if the defendant undertakes with the complainant to purchase property for him, and purchases the property for himself, he can be charged as constructive trustee of the property. Although the oral undertaking is not enforceable as a contract, because of lack of consideration or because the property is an interest in land, yet a fiduciary relation is created and the fiduciary will not be permitted to profit through a breach of his duty as fiduciary. *By undertaking to purchase the property for the complainant, the relation of principal and agent is created. Such a relation arises where one person undertakes to act for and in behalf of another, even though the undertaking is gratuitous and oral.* Accordingly, it is held that a person who undertakes to purchase land for another and who purchases it for himself is chargeable as constructive trustee of the property, even though the undertaking is gratuitous and oral." (Emphasis added.)

To the same effect is Bogert, Trusts and Trustees §488 (2d ed. 1960).

The rule of the Restatement, Scott, and Bogert was predated by the early Illinois case of *Switzer v. Skiles* (1846), 8 Ill. (3 Gilm.) 529, which is a case factually similar to the one under consideration, *i.e.*, a person undertook voluntarily and gratuitously to purchase land on behalf of others and, subsequent to the purchase, kept the land for his own use and benefit. The court brushed aside the defense to Statute of Frauds and declared a constructive trust, stating:

"He [defendant] did not profess to act for himself in the purchase of the lots. He undertook to purchase them for the benefit of those who had succeeded to the possessory rights of Miller. This precluded him from acting on his own account in the transaction. A person who agrees to act for another is not allowed to deal in the business of the agency for his own benefit, and if he take a conveyance in his own name of an estate which he agreed to purchase for another, he will, in Equity, be considered as holding the estate in trust for his principal. * * * A court of equity will not permit the defendant, after obtaining the title to the property under such circumstances, to sacrifice and disregard the interests of those for whom he acted, and convert the property to his own use. 1 Story's Eq. Jur. sec. 223. To allow him to appropriate to his own use the fruits of the purchase, would be permitting him to take advantage of his own wrong, and thereby perpetrate a gross fraud on the complainants. He cannot escape the consequences of such iniquitous conduct by sheltering himself behind the Statute of

Frauds, the provisions of which statute were designed to furnish a protection against fraud, and not to be set up as a shield and support for fraud.

\* \* \* He cannot now set up the want of consideration as an excuse for not complying with the terms of his undertaking. This might have been a valid reason for declining to enter on the performance of his agreement in the first instance, but it cannot shield him from responsibility after he has once entered on the execution of the trust. It is sufficient that he undertook to perform the trust and thereby obtained the trust property. A mere agreement to execute a trust *in futuro,* without compensation, is not obligatory; but when the trust is undertaken and actually commenced, the trustee is bound to proceed and execute it with the same diligence and good faith, as if he were to receive a liberal reward for his services. The confidence reposed in him, the actual entering on the duties of the trust, and the injury which may result to the beneficiary if he do not faithfully perform it, are regarded as a good and sufficient consideration. 2 Kent's Com. 466; *Rutgers v. Lucet,* 2 Johns. Cases, 92." 8 Ill. (3 Gilm.) 529, 534-35.

Other Illinois cases have applied the same principle in similar factual situations. In *Dennis v. McCagg,* 32 Ill. 429, the court stated:

"Here then, is the most abundant proof of the relation in which McCagg stood to these parties, as a confidential agent, intrusted with the conduct of business, claiming the highest exhibition of morality and integrity; a volunteer, if you please, but still professing to act not for himself, but for others who had placed their confidence in him. In equity he was disabled from dealing in the matter of his agency, on his own account, 1 Lead. Cas. in Eq. *(White v. Tudor's)* 75, and the agency being established, he will be compelled to transfer the benefit of his contract, although he may swear he purchased on his own account." (32 Ill. 429, 444.)

Also see *Doner v. Phoenix Joint Stock Land Bank,* 381 Ill. 106, 45 N.E.2d 20; *Watson v. Union Iron & Steel Co.,* 15 Ill. App. 509.

Any further citations would needlessly expand an already too long dissertation but additional case authorities abound. For instance, *Mianulli v. Gunagan* (1954), 32 N.J. Super. 212, 108 A. 2d 200, is practically identical on its facts to the case under consideration here and, in reliance upon the Restatement of Restitution §194 and Scott on Trusts, as above set forth, imposed a constructive trust on the purchaser who had used his own funds in making the purchase.

It is my opinion that the majority has placed far too narrow an interpretation on the term "fiduciary or confidential relationship," as used in the context of a constructive trust. I take issue with the majority's interpretation of the evidence relating to the transactions between

plaintiff and defendants. Such mistakes have apparently guided them to the erroneous conclusion they have reached.

The majority opinion states that the record reflects that plaintiff identified the property and the person from whom the owner's name and address could be obtained before any oral agreement was made to purchase the property jointly. This is incorrect. The testimony shows that Robert Ray and Emerson Winter went to the land in question and there agreed that Ray would purchase the land and later convey to Winter the 20 acres south of the road. After the two men made this agreement, they went to the home of William Marsh, a neighboring landowner and the overseer of the 60 acres for Mullikin (the owner). They told Marsh of their agreement for dividing up the land. (Prior to this time Ray had contacted Marsh, Marsh had given Ray Mullikin's name and phone number, and Ray had contacted Mullikin and obtained Mullikin's promise to hold the land for him.)

The following is taken from the abstract of testimony prepared by defendants.

Testimony of plaintiff Robert Ray:

"A. No, sir. Mr. Mullikin had told me he's [sic] hold it for me.

Q. When did Mr. Mullikin tell you that?

A. It was in July, Before Mr. and Mrs. Winter came to Thompsonville. We [witness and Mr. Winter] went to Bill Marsh's home while we was over there at the ground. We was going to tell him that we was goin' to divide it up. Yes, sir, we told him that."

Testimony of William Marsh:

"Q. I'll ask you again, Mr. Marsh, if you know the purpose for Mr. Winter being in your home?

A. Well, they were there and they were talking about buying that place and dividin' it up, one takin' one part and one the other. That's right, they were talking about this in my presence. No, I don't know the terms of the agreement. That's right, they were talking about dividing the property. Yes, sir, the property is naturally divided by a road. Approximately 40 acres lie north of the road. Would be approximately 20 lie south of the road.

Q. Do you know, Mr. Marsh, who was to get the property north of the road?

A. Robert Ray.

Q. And do you know, of your own personal knowledge, who was to get the property south of the road?

A. The Winters."

Testimony of defendant Emerson Winter:

"So we went up there and he said, 'This is the 20 acres and this is the 40 acres,' and he said, 'You can have this.' I said 'Fair enough.'

So we went up there and he introduced me to this Mr. Rose and

he wanted to sell me some ground. I said, 'I'm a poor retired G.I., you know.' That's a by-word, you know, poor G.I., you know, and he, this Mr. Rose said that, 'If you want it, you'd better get it.' He said, 'Someone else was lookin' at it,' and I said, "Ray, if you can't get it, then,' I said 'I will.'" (Winter is mistakenly referring to Marsh as "Mr. Rose.")

It is significant, too, that the defendants did not obtain the name and phone number of the owner from Marsh (the overseer), but rather they obtained it from plaintiff.

Testimony of defendant Joyce Winter:

"Yes, I called him [Mullikin] on the phone. I came to know Mr. Mullikin through—Mr. Ray gave us the phone number to call. This was August 15th, of 1972. July the 28th was the date of our visit to Thompsonville."

Testimony of defendant Emerson Winter:

"So that night I call Ray up, I got the phone number, I called it from there and I called Mr. Marsh up, I called Ray up, and I said 'Ray,' I said, 'Why don't you call Mr. Marsh up?' and he said, 'No you call him up,' and I said, 'Well, give me his phone number.' He said, 'OK', so he gave it to me. So I called Mr. Mullikin. Now, wait, I got the name mixed up-Mr. Mullikin's phone number. So he gave me Mr. Mullikin's phone number and I called Mr. Mullikin up and I said, 'Mr. Mullikin, this is Mr. Winter,' and I said, 'talkin' to Ray down here in Thompsonville that he wanted to buy and he couldn't get the money for,' and he said 'OK' he said, 'You can have it then.'"

The testimony of plaintiff Ray relates the agreement between plaintiff and defendants to have defendants Winter purchase the entire 60 acres and later convey the 40 acres north of the road to plaintiff.

Testimony of plaintiff Robert Ray:

"Q. When did you next hear from either Mr. or Mrs. Winter?

A. It was probably a couple of weeks afterward. By phone.

Q. With whom did you talk on the phone?

A. Mr. Winter. He was afraid that land was goin' to get away from us and he was wantin' to go ahead and buy it then and I told him I couldn't until September. He wanted to know then how about him goin' ahead and gettin' it in his name and then when I got-whenever I got ready he would convey the land north of the road over to me. Yes, sir, that was agreeable to me.

Q. Did you consult Mr. Marsh about this arrangement?

A. No, sir, I told Mr. Mullikin. Yes, sir, I explained the arrangement to Mr. Mullikin.

\* \* \*

Q. You say that you had talked to Mr. Mullikin; and when was the first time you talked to him?

A. It was in July.

Q. And he said that he would hold the property for you?

A. Yes, sir.

* * *

Q. What did you talk to him about on the second time?

A. About my and Mr. Winter's agreement to go ahead and let Mr. Winter have the ground with the understanding that he was goin' to turn it over north of the road to me.

Q. What did you talk to him about the first time?

A. About the ground. If it was for sale, how much it was and would he hold it for me.

Q. And then you had another call to him in August; and what was the purpose of that call?

A. To tell him about mine and Mr. Winter's agreement."

In his testimony, defendant Emerson Winter denied that he agreed with plaintiff Ray to convey 40 of the 60 acres to Ray after making the purchase from Mullikin. However, that such an agreement actually existed is clear from the actions of the parties subsequent to the time of the agreement. For example, in a letter sent from defendant Joyce Winter to Lodema Ray (plaintiff's wife) on January 18, 1973, Joyce Winter stated: "But now Spike [Emerson Winter] feels that he has to keep all the ground as he has so much involved—tied up in it." Obviously, if Winter "now" felt he had to keep "all" the ground, at some prior time he must have intended not to keep all of it. This letter was admitted into evidence at trial and appears in the record. The full body of the letter reads:

"Dear Lodema,

Received your card yesterday. Was sorry to learn of Dale's dad having a coronary. Sure hope that all turns out well for him.

Now, about the land. I find this so difficult to put down in words as I don't want you to feel hurt or angry. But now Spike [Emerson Winter] feels that he has to keep all the ground as he has so much involved—tied up in it. What seemed to be such a simple thing in the beginning has grown from a mole hill into a mountain. Bob [Robert Ray] didn't want to involve your place at all in mortgage yet Spike offered ours, and this made me very unhappy. In fact, I can honestly tell you that I just didn't care if the loan and everything else involved came through at all. I prayed much about it. Finally when it did come the day before Thanksgiving it was all on one deed including stamps etc. So now Spike says that the way things now are he would like to really settle down there, build a home and do some farming. We would have come see you only

Spike has had the flu. Only went back to work on Tues., missing over a week of work.

We shall hope to get down to see you. Please write and let me know how you feel about all this.

With love in my heart.

Joyce"

It is apparent from the testimony of Emerson Winter that it was not until some time after Winter had dealt with Mullikin that Winter decided not to convey the 40 acres to Ray. Even after Winter dealt with Mullikin, Winter still only wanted to have 20 of the 60 acres. In fact, it was only because Ray wrote a "nasty" letter to Winter that Winter ultimately refused to convey.

Testimony of Emerson Winter:

"Q. So that the sequence would have been this letter—which is evidence—, a letter written by Mr. Ray to you, and then a letter from you to Mr. Ray saying 'If all this hadn't happened we could get together'? We could get together on what?

A. Well, get together on the ground. Like I—he didn't want the 60 acres. I mean, I had to buy the 60 acres to get the 20 acres, because he couldn't—he didn't have the money, sir. No, sir, I didn't want the 60 acres.

Q. Have you been furnished with a copy of this complaint in this lawsuit?

A. I think so. Yeah.

Q. You didn't want the ground?

A. Not the 60 acres, no, sir. I'm retired. I didn't have the money—I ain't got the money.

Q. When did you decide that you did want the ground?

A. When he wouldn't give me no money on it. In other words, I wasn't mortgagin' my house, sir, for a man that I didn't know.

Q. When was he supposed to have given you money on it?

A. In August. In August or Sep—when—when it went through.

Q. Now wait. It didn't go through until October 24th. That's the date of the deed.

A. He's gettin' me mixed up here. He wouldn't mortgage his house for the ground, and the only way I could get this ground—20 acres—was to buy the whole 60 acres, so actually, like I say, I really didn't want the 60 acres, because I didn't want to mortgage my house for him, right? OK, so I mortgaged my house and he didn't and where does that leave me with the ground?

* * *

Q. Well, why did you not try to buy just the 20 acres?

A. I was dealin' with Ray. Ray said he wanted to sell me the 20 acres.

Q. All right; and you only wanted the 20 acres?

A. Right.

Q. You didn't want the 60 acres?

A. Not to pay the mortgage my house. No, sir."

The majority says that there is no evidence of an intent to defraud plaintiff at the time of the alleged agreement. They also say that there is no evidence to establish that a confidential relation existed between defendants and plaintiff at the time of the agreement, and that friendship and the exchange of favors does not establish a fiduciary relationship. These statements are but a recital of truisms which have no real relevance to the case. The majority has erred in looking to the nature of the relationship between the parties antecedent to the agreement. They have ignored the rule of law applicable to this case as it is plainly expressed in the Illinois cases, the Restatement, Scott on Trusts, and the other authorities cited above. That rule is that the fiduciary or confidential relationship arises at the time of the agreement, no antecedent relationship is necessary.

> "The undertaking to act for the other is sufficient to constitute the relation of principal and agent between them. * * * It is sufficient to create the relation that the one authorizes the other to act for him in making the purchase and the other undertakes to do so." Restatement of Restitution §194, Comment on subsection (2) (1937).

In the instant case, plaintiff located the 60 acres, contacted the owner, Mullikin, negotiated the sale-purchase agreement at the admittedly attractive price, and obtained Mullikin's agreement to hold the land until the fall of the year. Plaintiff then, after learning of the desire of defendants, his friends, to purchase some land, took defendants into his confidence by telling them of the land owned by Mullikin and of the agreement he had negotiated with Mullikin. Plaintiff then offered to sell defendants 20 acres of this land (about which defendants would otherwise not have been aware) at no profit to himself. Eventually plaintiff, at the suggestion of defendants, advised defendants of how they could contact Mullikin to purchase the land, with the understanding that the 60 acres would be divided between plaintiff and defendants as originally agreed. Defendants then reneged on their agreement with plaintiff, stripped plaintiff of his admittedly attractive deal, and kept the entire 60 acres for themselves. These facts are solidly established by the evidence of record, they are even apparent from the testimony of defendants. The letter from Mrs. Winter to Mrs. Ray shows conclusively

588

that the defendants *changed their minds* and decided to keep *all* the land. Such evidence, if not ignored, is not only persuasive, it is conclusive.

For the trial of this case a six-man jury was empanelled, at the request of defendants, to hear the evidence. Their verdict, although advisory only in this chancery case, was favorable to plaintiff. In addition, over plaintiff's objections, special interrogatories were submitted by defendants and answered by the jury favorably to plaintiff. Moreover, under the above set of facts the trial court found both that fraud had occurred and that a fiduciary relationship had existed and imposed a constructive trust.

Under the authorities above quoted and referred to the trial court and jury were unquestionably correct. I would affirm.